Argued and submitted July 9, 2002, affirmed February 5, 2003

## CLINTON WENDELL CUNNINGHAM,
*Appellant,*

*v.*

## S. Frank THOMPSON,
Superintendent,
Oregon State Penitentiary,
*Respondent.*

95C-11416; A107806

62 P3d 823

222-b

Eric M. Cumfer argued the cause for appellant. With him on the brief was James N. Varner.

Kathleen Cegla, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Landau, Presiding Judge, and Deits, Chief Judge, and Brewer, Judge.

BREWER, J.

**BREWER, J.**

After a jury trial, petitioner was convicted of aggravated murder and sentenced to death. The Oregon Supreme Court affirmed. *State v. Cunningham*, 320 Or 47, 880 P2d 431 (1994), *cert den*, 514 US 1005 (1995). Petitioner sought post-conviction relief, asserting that the trial court violated his constitutional rights in two respects and that his trial counsel provided inadequate assistance in numerous respects. The post-conviction court denied relief. We review for errors of law, ORS 138.220, and affirm.

We summarize the underlying facts from the Supreme Court's opinion on direct review, leaving to our discussion of petitioner's assignments of error a description of other pertinent historical and procedural facts. In October 1991, petitioner and two other men, Travis Allison and Troy Johnson, were traveling in the Coos Bay area in a pickup truck driven by petitioner. On their way to some nearby sand dunes, they picked up a female hitchhiker, Shannon Faith, who accompanied them to the dunes. Later that day, petitioner dropped Allison and Johnson at Johnson's house. Petitioner and Faith then went to the house of Faith's friend, Moyer, where Faith informed Moyer that she was going to Eugene with petitioner. Moyer tried to talk Faith out of leaving and wrote down petitioner's name and the truck license number. Petitioner and Faith left. *Cunningham*, 320 Or at 49.

Early the next morning, petitioner returned alone to Johnson's house. Around mid-day, a motorist found Faith's body in a remote wooded area about nine miles west of Drain. She was wearing a shirt and socks, but no pants or underpants. She had been stabbed approximately 37 times on her face, neck, breasts, back, abdomen, and hands; some of the wounds were defensive wounds. The location of various bloodstains indicated that she had not been wearing pants at the time she was stabbed. *Id*. at 49-50.

Tests revealed the presence of sperm and seminal fluid in Faith's vagina. Medical examiners also found an abrasion near her perineum and four abrasions along the inside of her thigh. Faith's pants and underpants were later

found stuffed into a bag that had been thrown into some nearby bushes. The outside of her pants had little or no blood on them. Neither her pants nor her underpants had sperm or seminal fluid on them. *Id.* at 50-51.

After seeing or hearing news reports of the crime, both Moyer and Johnson contacted the police. Petitioner was later arrested in Oklahoma. He admitted driving the pickup truck and picking up the victim but asserted that he and the victim had had consensual sex, that he had then resumed driving, and that, some time later, she grabbed his knife and came at him. Petitioner stated that he cut the victim's hand while taking the knife away from her; that, after she continued coming at him, he pushed her away with the knife; that she fell to the ground; and that, as he dragged her from his truck to a ditch, some of her clothing came off. Petitioner admitted stabbing the victim "three or four times"; he also admitted throwing her bags into the bushes, throwing his knife into a creek, and disposing of his own bloody clothing in a dumpster. The knife and petitioner's clothing were recovered. Petitioner later performed a videotaped reenactment of what he asserted had occurred. *Id.* at 51-52.

Petitioner was indicted on two counts of aggravated murder, one count of intentional murder, and two counts of rape in the first degree. ORS 163.095(2)(d); ORS 163.095(2)(e); ORS 163.115(1)(b); ORS 163.375.[1] One of the aggravated murder counts alleged that petitioner murdered the victim in the course of and in furtherance of the crime of rape in the first degree; the other alleged that he murdered the victim in an effort to conceal the commission of the crime of rape in the first degree. After a jury trial, petitioner was convicted on all counts. The trial court merged the convictions and, pursuant to the jury's penalty phase verdict, sentenced petitioner to death. As noted, on direct appeal, the Oregon Supreme Court affirmed the convictions and sentence.

Petitioner sought post-conviction relief. He alleged in part that the trial court in his criminal proceeding erred in failing to assure that he personally waived his right to testify

---

[1] Citations are to the 1991 versions of the statutes.

and in failing to conduct a hearing on the question of whether he should be restrained by leg irons at trial. Petitioner also alleged that his trial counsel was inadequate in numerous respects in violation of his right to counsel guaranteed by Article I, section 11, of the Oregon Constitution and the Sixth and Fourteenth Amendments to the United States Constitution. The post-conviction court made findings as to each of petitioner's allegations and denied relief. Petitioner appeals.

■ We begin by considering petitioner's claims based on the described actions of the criminal trial court. In those regards, the state[2] responds that petitioner could have, and did not, raise those issues in his criminal trial or on direct appeal and that he does not argue in these claims that his failure to do so was the result of inadequate assistance of counsel in those proceedings. The state contends that petitioner therefore is barred from raising those issues in this post-conviction proceeding. We agree and therefore do not consider the issues further. *See* ORS 138.550(1); *Palmer v. State of Oregon*, 318 Or 352, 358, 867 P2d 1368 (1994).

■ We turn to petitioner's numerous claims of inadequate assistance of criminal trial counsel. To prevail on a post-conviction claim of inadequate assistance of counsel under Article I, section 11, of the Oregon Constitution, petitioner has the burden of showing, by a preponderance of the evidence, facts demonstrating that his criminal trial counsel failed to exercise reasonable professional skill and judgment and that counsel's failure had a tendency to affect the result of his criminal trial, that is, that petitioner suffered prejudice as a result. ORS 138.620(2); *Trujillo v. Maass*, 312 Or 431, 435, 822 P2d 703 (1991); *Horn v. Hill*, 180 Or App 139, 149, 41 P3d 1127 (2002). To show that trial counsel's representation violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution, petitioner must show that counsel's acts or omissions were not the result of an exercise of reasonable professional judgment and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would

---

[2] For clarity, we refer to defendant in this post-conviction proceeding, who is the superintendent of the correctional institution where petitioner is confined, *see* ORS 138.570, as "the state."

have been different. *Strickland v. Washington*, 466 US 668, 104 S Ct 2052, 80 L Ed 2d 674 (1984). *See* ORS 138.530(1)(a) (post-conviction relief is available for substantial denial of rights under the state or federal constitution); *see also Lichau v. Baldwin*, 333 Or 350, 358-59, 39 P3d 851 (2002) (setting out standards and methodology for considering ineffective assistance of counsel claims under state and federal constitutions). The reviewing court will not second-guess a lawyer's tactical decisions unless those decisions reflect an absence or suspension of professional skill and judgment; however, tactical decisions must be grounded on a reasonable investigation, that is, one that is legally and factually appropriate to the case. *Gorham v. Thompson*, 332 Or 560, 567, 34 P3d 161 (2001); *see also Carias v. State of Oregon*, 148 Or App 540, 544-45, 941 P2d 571 (1997) (professional skill requires at least an attempt to find out the facts before a final tactical decision is made).

■ We are bound by the factual findings of the post-conviction court if they are supported by evidence in the record. *Lichau*, 333 Or at 359; *see also Krummacher v. Gierloff*, 290 Or 867, 869, 627 P2d 458 (1981). If the post-conviction court does not make express findings on an issue, we assume that it decided the facts in a manner that is consistent with its ultimate conclusion on that issue. *Lichau*, 333 Or at 359 (citing *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968)). We review the post-conviction court's legal conclusions for errors of law. ORS 138.650; ORS 138.220.

In his first assignment of error, petitioner argues that his criminal trial counsel was inadequate by reason of failing to obtain a private polygraph examination that, according to petitioner, would have demonstrated that he and the victim had had consensual sex and therefore "would have impacted plea negotiations" between petitioner and the prosecutor.[3] In the post-conviction hearing, petitioner presented the testimony and written report of a private polygraph examiner, Wygant. Wygant testified that, in November 1998, he had administered a polygraph examination to

---

[3] Petitioner's criminal trial counsel, Hendershott, testified in the post-conviction hearing that, at the time of trial, petitioner had denied raping the victim but that he did not recall talking to petitioner about taking a polygraph.

petitioner, during which he had asked petitioner three questions: "Did you physically force [the victim] to submit to sex while she was refusing or resisting?"; "Did you have sex with [the victim] at the same location where she died?"; and "When you had sex with [the victim], did she put up any resistance?" Wygant testified that petitioner's negative answers to the first and third questions were "definitely truthful," and that his negative answer to the second question was "inconclusive" as to truthfulness.

Petitioner also presented testimony by two lawyers, Bernier and Arneson, who had practiced criminal defense in Douglas County since 1977. Bernier testified that it was a "common practice" for criminal defense counsel to obtain a private polygraph examination of a defendant who was "maintaining his innocence" and that, in his experience, when a client passed a private polygraph examination, he had

> "never had the result be the District Attorney would refuse to consider it. I know that in each case in my practice, it has either resulted in dismissal * * * or it has resulted in the plea bargain we are trying to get. * * * I am unaware of a case in my time in Douglas County where a defendant has passed a polygraph that hasn't resulted in some benefit to him."

Arneson testified that he used polygraphs whenever a client was "telling me something that is substantially different from the facts that the State has" and that, "[i]f the polygraph results are favorable, I'll disclose them to the prosecutor." He stated that he was "nearly certain" that, if one of his clients denied committing the conduct that constituted an aggravating factor in a charge, he would use a polygraph as "something to attempt to persuade the District Attorney."

Finally, petitioner presented the August 1998 deposition testimony of Patricia Champion, the prosecutor in petitioner's criminal trial. In the deposition, petitioner's post-conviction counsel asked Champion whether the district attorney's office had "any type of policy or consideration of polygraph[,] when the defendant's passed one[,] what kind of weight was given to that or how you handled that?" Champion replied:

> "It depends on the case. If there was a question in my mind whether or not something really occurred, I would look at polygraph information and weigh that after talking with a polygraph examiner assuming that the polygraph had been done by the polygrapher of my choice."

Counsel also asked whether, if petitioner had taken a polygraph administered by an examiner of her choice and had passed it "on the issue that there was no forcible sexual relationship," would she have "given some weight" to that. Champion replied, "I would have looked at that." She also testified that she "always considered" plea offers.

However, when asked whether, in this case, she would have considered an offer of, "for example, * * * life without parole," Champion testified that "I would not have taken that offer," because of the "nature of the crime and because of the background of [petitioner], and also how it fit in regard to our other death penalty cases."[4] Champion explained that the issue of whether petitioner raped the victim was "one of the key issues in the case." She testified that, in her mind, "part of the strongest evidence" of rape was the fact that, although petitioner had asserted that he and the victim had had consensual sex "about 20 miles down the road from where she was killed," the victim's pants were down around her ankles when the fatal attack occurred and there was blood on her legs, rather than on her pants.

In a later-executed affidavit also received in evidence at the post-conviction hearing, Champion averred that she would have "considered" the results of a polygraph examination of petitioner "conducted by a polygrapher of my choice." She also stated that, if petitioner's criminal trial counsel had offered her the results of a private polygraph examination, she would have submitted that report for review by an Oregon State Police (OSP) polygraph examiner and would have "required a re-test" conducted by an OSP examiner before considering the results for purposes of plea negotiations.

---

[4] As discussed below in the context of petitioner's eleventh assignment of error, Champion also testified in the deposition that she did not make an offer of life without parole to petitioner.

The post-conviction court found as fact that the prosecutor in petitioner's criminal trial "would not have relied on the polygraph examination results submitted by petitioner in [the post-conviction] proceeding in order to negotiate the Aggravated Murder charges against petitioner down to some lesser charge." The court concluded that petitioner's criminal trial counsel exercised reasonable professional skill and judgment in his representation of petitioner, that petitioner was not prejudiced in any respect, and that petitioner therefore was not denied his constitutional right to assistance of counsel.[5]

■ In this court, petitioner argues that he met his burden to show that trial counsel's failure to obtain a private polygraph examination and to use the results of such an examination in conducting pretrial negotiations with the prosecutor constituted a failure to exercise reasonable professional skill and judgment that, moreover, prejudiced him. Petitioner points to evidence that, as of the time of the post-conviction hearing, he had passed a polygraph examination and to Champion's deposition testimony that she "would have looked at" that result; he asserts that the trial court's finding that the prosecutor "would not have relied" on the polygraph examination submitted by petitioner in the post-conviction hearing therefore is not supported by the record. Petitioner also argues that he was prejudiced because favorable private polygraph examination results on the issue of whether he had had consensual sex with the victim likely would have caused the prosecutor to attempt to confirm those results using a polygrapher of her choice, further resulting in a more favorable plea offer either as to the crime charged or as to the sentence sought.

The state responds that, although Bernier and Arneson each testified that he had successfully used private polygraph examinations in plea negotiations with Douglas County prosecutors, neither testified that he had done so in negotiations with the prosecutor in petitioner's case. The

---

[5] The post-conviction court's legal conclusions regarding the adequacy of petitioner's criminal trial counsel applied to each of petitioner's specific claims of inadequate assistance. For brevity's sake, we do not reiterate those conclusions in our discussions of petitioner's remaining assignments of error on appeal.

state also points to evidence that, although Champion would have "looked at" private polygraph results, she would not have accepted those results but would have required that petitioner be retested by an OSP polygrapher before considering polygraph results for plea negotiation purposes. The state argues that, even assuming that trial counsel failed to exercise reasonable professional skill and judgment in failing to obtain a private polygraph, petitioner failed to demonstrate that he was prejudiced, because he adduced no evidence that he could have passed a test conducted by an examiner of the prosecutor's choice. Finally, the state argues that the record lacks evidence of the existence of the prosecutor's stated precondition for considering a polygraph result, namely, that there be a "question in [her] mind whether or not something really occurred"; the state argues that, to the contrary, the record demonstrates that the prosecutor believed that there was strong evidence that petitioner had raped the victim.

Although we generally would first consider whether trial counsel failed to exercise reasonable professional skill and judgment in failing to obtain a private polygraph examination, we need not address that issue here. We conclude that, even if trial counsel failed to exercise reasonable skill and judgment in the manner asserted, petitioner was not prejudiced as a result. It is true that Champion testified by deposition that, generally, "if there was a question in [her] mind whether or not something really occurred," she would "look at" and "weigh" polygraph information. She also testified that, if petitioner had passed a polygraph examination administered by an examiner of her choice "on the issue that there was no forcible sexual relationship," she would have "given some weight" to and "looked at" that result, because the issue of whether petitioner raped the victim was a "key" issue. However, Champion also stated that, although she "always considered" plea offers, she "would not have taken" an offer of life without parole in this case because of "the nature of the crime" and petitioner's "background."

The described evidence supports the trial court's implicit finding that, even if petitioner's criminal trial counsel had submitted the results of a private polygraph to

Champion, and even if petitioner had then passed a polygraph examination administered by a polygrapher of Champion's choice, Champion would not have accepted a plea of guilty to intentional, rather than aggravated, murder or offered petitioner a sentence of less than death. Accordingly, even assuming that the record demonstrates that petitioner's criminal trial counsel failed to exercise reasonable professional skill and judgment by failing to obtain and submit a private polygraph, petitioner did not demonstrate that he was prejudiced by trial counsel's failure. *See Saroian v. State of Oregon*, 154 Or App 112, 117, 961 P2d 252 (1998) (citing *Hill v. Lockhart*, 474 US 52, 59, 106 S Ct 366, 88 L Ed 2d 203 (1985); *Moen v. Peterson*, 312 Or 503, 513, 824 P2d 404 (1991)) (generally, as applied to plea issues, the "prejudice" requirement focuses on whether criminal trial counsel's constitutionally inadequate performance affected the outcome of the plea process). The post-conviction court did not err in concluding that petitioner was not entitled to post-conviction relief on the ground asserted in his first assignment of error.

We turn to petitioner's second and third assignments of error, in which he asserts that his criminal trial counsel was inadequate by failing to obtain DNA testing of toilet tissue found between the victim's legs and of swabs from the victim's vaginal cavity and clothing; and by failing to obtain and introduce evidence that the victim was a prostitute.[6] Petitioner alleged in his petition for post-conviction relief that DNA testing of the tissue and the swabs, as well as evidence that the victim was a prostitute, would have shown that the victim had had sexual contact with males other than petitioner and, in turn, would have provided an alternative explanation for the existence of her vaginal abrasion, thus casting reasonable doubt on the state's allegation that he had raped the victim.

Evidence at petitioner's post-conviction hearing included the transcript of petitioner's criminal trial. As pertinent to the toilet tissue, Wilcox, a criminalist from the OSP forensic lab in Coos Bay, testified at petitioner's criminal trial that she had been called to investigate the crime scene where

---

[6] Petitioner combines his argument on those two assignments of error, and we likewise consider them together.

the victim's body was found and that, among other items she discovered,

> "[t]here was a piece of pink toilet tissue between [the victim's] legs with some drops of blood on it. And I seized that as a piece of evidence since it was right near her and the blood was most likely hers. There was other toilet tissue at the scene. I think people had stopped and gone to the bathroom there. I seized that piece since it was right near the body."

On cross-examination, Wilcox testified that there had been toilet tissue "in the ditches and behind the dirt bank and it was—it's a pit stop for people off of Highway 38." She agreed that she had no way of knowing whether the tissue found between the victim's legs had had some association with the victim's body or whether the body had just happened to be placed where there was a piece of tissue. Wilcox stated that she collected the tissue because it had a fresh blood stain on it and that she did not know if the blood stain was "accidental" or when the tissue had been thrown there. Wilcox testified that she had tested the tissue and had not found the presence of seminal fluid. As to the swabs, Wilcox testified at petitioner's criminal trial that she had obtained vaginal, rectal, and oral swabs from the victim's body.

At the post-conviction hearing, petitioner's criminal trial counsel, Hendershott, testified that he had not attempted to obtain DNA tests of the victim's vaginal swabs because, at the time of the trial, petitioner had admitted having sex with the victim and counsel was unaware at that time that Moyer, Allison, or Johnson might also have done so. Petitioner's investigator in the post-conviction proceeding, Harmening, testified that, at the time of petitioner's criminal trial, a forensic laboratory would have been able to test even a trace amount of sample for that purpose. She testified that, before petitioner's post-conviction hearing, she had attempted to arrange for the vaginal swabs to be subjected to additional testing for the presence of "mixed semen," but that the Douglas County sheriff's office had been unable to locate the swabs.

As to petitioner's theory that the victim had been engaged in prostitution, Hendershott testified that his investigator in petitioner's criminal trial, Hostetler, had obtained

information about possible criminal and juvenile charges against the victim in Canada but that the investigator had been unable to obtain the actual records of those charges because the records were confidential.[7] Petitioner's investigator in the post-conviction proceeding, Harmening, testified she had been able to obtain records of two of the charges within one week of requesting them. One of the charges, for which the written record was also entered in evidence in the hearing, was for the offense of communicating with a police constable for the purpose of engaging in prostitution; the offense allegedly occurred approximately three weeks before the victim was killed. Petitioner also presented evidence of the written report of a Canadian lawyer, prepared for the purpose of the post-conviction proceeding, setting out details of other Canadian charges against the victim and other named persons. Harmening testified that the report was obtained "within a month" of petitioner's completed request to the lawyer.

Also as to the possibility that the victim had had sex with other males, petitioner introduced in evidence three affidavits. First, petitioner introduced the affidavit of his sister, Eileen Tiffee, who averred that, around the time of petitioner's criminal trial, "Travis" (presumably Travis Allison) had told Tiffee that he, "Troy" (presumably Troy Johnson) and petitioner had all had sex with the victim and that the victim "was a prostitute." Second, petitioner introduced the affidavit of Paula Ollar, also known as Paula Harris, who averred in part that, shortly after petitioner was charged in his criminal case, Travis had told her that "he and another guy" had had sex with the victim and petitioner "took all the rap." Third, petitioner introduced the affidavit of Shannon Baldwin, who averred that, at some time in 1997, she had had a telephone conversation with the prosecutor, Champion, regarding petitioner's personal property and that, during that conversation, Champion told her that the victim had been a prostitute.

---

[7] Hostetler's handwritten notes pertaining to the Canadian charges were also admitted in evidence in the post-conviction hearing. The notes, dated June 30, 1992, consist of the heading "Faith" and a list of what appear to be case numbers, without any further information regarding the charges involved.

Petitioner testified in the post-conviction proceeding that he could not remember whether he told his criminal trial counsel that Johnson and Allison had also had sex with the victim.

As pertinent to petitioner's second and third assignments, the post-conviction court found that blood was found on a piece of toilet tissue in the vicinity of the victim's body, that no seminal fluid was found on the tissue, and that other toilet tissue was found at the crime scene. The court also found that, although petitioner had presented hearsay evidence (that is, the described averments of Tiffee, Harris, and Baldwin) that the victim had had, or may have had, sex with other males, the evidence did not demonstrate that the affiants had given that information to the police or petitioner's trial attorney or that the information was available at the time of petitioner's criminal trial; in addition, petitioner himself did not recall telling his trial counsel that the victim had had sex with Johnson or Allison. The post-conviction court found that petitioner did not show that the victim had had sex with anyone else or that counsel had any reason to "pursue [that] line of inquiry." The post-conviction court also found that petitioner had failed to show that the victim was a prostitute or that it was likely that her vaginal abrasion was caused by prostitution activities. Finally, the post-conviction court found that petitioner's criminal trial counsel had "tried" to obtain the victim's Canadian police records but was unable to obtain her juvenile records.[8]

■ Again, in this court, petitioner argues that his trial counsel was inadequate by reason of failing to obtain a DNA test of the toilet tissue, the vaginal swabs, and the victim's clothing and by reason of failing to investigate and introduce evidence that the victim had engaged in prostitution activity. He contends that evidence in the post-conviction hearing that the victim had spent the night before her death in the same bed as Moyer, that she had had sex with Johnson and Allison, and that she was a prostitute was sufficient to demonstrate that trial counsel's investigations as to those matters—

---

[8] In his brief on appeal, petitioner does not expressly challenge the post-conviction court's factual findings relating to the victim's alleged prostitution activities. However, his arguments in substance encompass those findings.

including his failure to obtain DNA testing of the swabs—did not reflect a reasonable exercise of professional skill and judgment. Petitioner further contends that he was prejudiced by trial counsel's failure because evidence that the victim had had sex with others would have supported his assertion that the victim consented to have sex with him, would have rebutted the state's assertion that the victim's vaginal abrasion was the result of forcible sex, and therefore would have cast doubt on the state's theory that he raped the victim.

The state responds that petitioner did not demonstrate that he was prejudiced by trial counsel's alleged failure to investigate whether the victim had had sex with other men near the time she was killed or by trial counsel's alleged failure to determine whether the victim had engaged in prostitution activity because he presented no evidence in the post-conviction proceeding of what any DNA testing of the swabs would have revealed. The state also argues that the testimony of the OSP criminalist, Wilcox—who testified in petitioner's criminal trial that her test of the victim's vaginal swab for sperm and seminal fluid produced "very weak" results—supports an inference that only one person, petitioner, had sex with the victim. The state argues that petitioner's evidence in the post-conviction proceeding that Allison and Johnson had had sex with the victim was hearsay and therefore would have been inadmissible in his criminal trial and that petitioner presented no admissible evidence on that point in the post-conviction proceeding. As to trial counsel's alleged failure to investigate whether the victim had worked as a prostitute in Canada, the state notes that trial counsel testified in the post-conviction proceeding that he had attempted to obtain the relevant records but was unable to do so because the victim was a minor and the records were confidential. The state also argues that prostitution activity by the victim, if any, was irrelevant to the rape charge against petitioner because, as Dr. Olson, a pathologist who also served as the Douglas County medical examiner, testified in petitioner's criminal trial that the victim's vaginal abrasion had probably been caused within an hour of her death. Also, in any event, Champion testified in the post-conviction hearing that other evidence at petitioner's criminal trial—particularly, evidence that the victim's pants were

off at the time she was stabbed—constituted the "key" evidence that the victim was raped.

Again, we review the post-conviction court's factual findings to determine whether they are supported by evidence in the record; we review the court's legal conclusions—including the determination whether petitioner's trial counsel's errors, if any, prejudiced petitioner—for errors of law. *See Ashley v. Hoyt*, 139 Or App 385, 395 n 8, 912 P2d 393 (1996) (determination whether trial counsel's conduct was prejudicial in a constitutionally cognizable sense is a legal conclusion, derived from predicate findings of historical fact). We conclude that the trial court's findings of fact are supported by evidence in the record. In particular, the record supports the trial court's findings relating to the lack of seminal fluid on the toilet tissue and its findings relating to the availability, or lack thereof, to trial counsel at the time of petitioner's criminal trial of information about the victim's sexual conduct, if any, with Allison, Johnson, or Moyer, or her prostitution activities, if any, in Canada. Relatedly, the record also supports the trial court's finding that trial counsel therefore had no reason to "pursue [that] line of inquiry."

■ We further conclude that, even assuming that trial counsel was inadequate by failing to further investigate any of the described factual issues, that inadequacy did not prejudice petitioner, for the following reason. In effect, petitioner's theory of post-conviction relief in his second and third assignments of error is that, notwithstanding the persuasiveness of the state's "key" evidence in his criminal trial demonstrating that he forcibly raped the victim—specifically, evidence that, at the time petitioner murdered the victim, her pants were off and thus that sexual intercourse and his fatal assault of the victim occurred essentially simultaneously—trial counsel was nevertheless inadequate for failing to investigate and obtain evidence supporting the theory that *other* indicia of forcible sex—particularly, the abrasion on the victim's vagina—were caused by one or more sexual encounters between the victim and other persons besides petitioner.

However, the county medical examiner, Olson, testified at the criminal trial that he was "convinced" that the victim's vaginal abrasion was "recent. It's certainly probably

within the same day[,] an hour before her death or during right before her death [*sic*]."⁹ That testimony suggests, at the least, that the abrasion was not caused by prostitution activities in Canada some days or weeks earlier or by the victim having "slept in the same bed" with Moyer the previous night. The record of the criminal trial also fails to demonstrate that the victim had had sex with Johnson or Allison, or both, on the day she died; nor, as to that point, did petitioner's hearsay evidence at the post-conviction hearing remedy that deficiency. Finally, and most significantly, there is evidence in the record that the victim was simultaneously sexually assaulted and murdered, namely, evidence that, when she was stabbed to death, her pants were down. Given the described state of the record, we cannot say that the evidence relied on by petitioner—assertedly showing that the victim may also (albeit at some earlier time) have had sex with other persons—would have tended to affect the result of petitioner's trial. Nor is there a reasonable probability that, but for counsel's failure to adduce such evidence, the result of petitioner's criminal trial would have been different. For all of the above reasons, petitioner's criminal trial counsel was not inadequate by reason of failing to investigate and offer evidence relating to the victim's purported sexual activities with other persons.

■ In his fourth assignment of error, relying in part on *State v. Dilts*, 28 Or App 393, 559 P2d 1326 (1977), petitioner contends that sexual abuse in the first degree, ORS 163.427, is a lesser included offense of rape in the first degree and that his trial counsel was inadequate by reason of failing to request a jury instruction on that lesser included offense because a finding by the jury that he was guilty of the latter offense would not have supported convictions for aggravated

---

⁹ Olson also testified that the abrasion "could be part of a sexual assault. It might not be. I can't absolutely[ly] state with confidence or certainty how it would be inflicted." He testified that it was "conceivable" that the abrasion was caused by the victim having been sitting on the lap of another individual while riding in the pickup truck and being "propelled forward," then "landing back on someone's legs." However, he believed that she would have had to land "in an unusual way" and believed that such an event also would have caused "other injuries, bruising about the thighs, buttocks, anal area * * *." Olson later reiterated that he could not be certain of the cause of the abrasion.

murder. The post-conviction court found that counsel originally had requested a jury instruction for sexual abuse in the first degree but that counsel withdrew that request because such an instruction "would have conflicted with the defense theory that petitioner and the victim had engaged in consensual sex at a location and time separate from where the victim was killed." The court also found that, in any event, the evidence at petitioner's criminal trial did not support a jury instruction on sexual abuse.

In this court, petitioner argues that there was evidence at his criminal trial from which the jury could have found that he had had sexual contact, rather than sexual intercourse, with the victim;[10] that trial counsel's failure to request an instruction on sexual abuse therefore constituted a failure to exercise reasonable professional skill; and that he was prejudiced because petitioner's rape convictions were the necessary predicates for his aggravated murder convictions. The state responds that, even assuming that there was evidence in the criminal trial record to support an instruction on first-degree sexual abuse, the record also demonstrates that petitioner's trial counsel made a tactical choice not to request such an instruction because it would have conflicted with petitioner's assertions to the police and at trial that he had had consensual sex with the victim at another location.

We agree with the state that, given petitioner's theory of his defense at trial—that he had had consensual sex with the victim—his trial counsel's deliberate choice not to request an instruction on first-degree sexual abuse constituted a reasonable tactical choice. This is not a case where "[n]o tactical advantage could have been gained" by not requesting the instruction. *See, e.g., Aquino v. Baldwin*, 163 Or App 452, 461, 991 P2d 41 (1999), *on recons*, 169 Or App 464 (2000) (where "[n]o tactical advantage could have been gained" by the petitioner's criminal trial counsel's choice not

---

[10] Petitioner points to testimony of a pathologist, Dr. Brady, that the victim's vaginal abrasion could have been caused by the victim having shaved her pubic area or by vigorous consensual sex and Wilcox's testimony that the weak results she obtained from testing the victim's vaginal swab for the presence of sperm and seminal fluid could be explained by a person ejaculating outside the victim's vagina.

to present certain evidence, trial counsel did not make a permissible tactical choice). The fact that trial counsel's tactical choice entailed a risk that the jury would find petitioner guilty of a crime that supported an aggravated murder conviction does not obviate the potential benefit that, consistently with petitioner's theory, the jury would find him not guilty of the greater offense of rape. "Adequacy of assistance of counsel * * * allows for tactical choices that backfire, because, by their nature, trials often involve risk." *Krummacher*, 290 Or at 875; *see also Lambert v. Palmateer*, 182 Or App 130, 135, 47 P3d 907 (2002) (where the postconviction petitioner's theory of defense in his criminal trial was that he struck the victim accidentally, it was a reasonable tactical choice for defense counsel not to develop and argue a defense of self-defense); *cf. State v. Boyce*, 120 Or App 299, 306, 852 P2d 276 (1993) (where the defendant testified that she injured the victim accidentally, trial court properly declined to give instruction on self-defense). In short, petitioner's criminal trial counsel's deliberate choice not to request an instruction on the lesser included offense of firstdegree sexual abuse was a product of reason and professional judgment. The post-conviction court did not err.[11]

■ In his fifth assignment of error, petitioner argues that his criminal trial counsel was inadequate by reason of failing in the guilt phase of his trial, to request a jury instruction regarding his decision not to testify.[12] Petitioner asserts that it was not a reasonable tactical choice not to request the instruction, because giving it can have no adverse effect. He also argues that he was prejudiced by counsel's failure to request the instruction because it is likely that the jury drew an adverse inference from his failure to testify. Petitioner

---

[11] We also note that, in *State v. Spring*, 172 Or App 508, 21 P3d 657, *rev den*, 332 Or 559 (2001), this court overruled *Dilts*. We reasoned that sexual abuse is not a lesser included offense of rape because

"[r]ape requires sexual intercourse, whereas sexual abuse does not. Conversely, sexual abuse requires sexual contact, which requires touching the sexual or intimate parts of another person *for the purpose of arousing or gratifying the sexual desire* of either party, whereas rape does not. * * * [E]ach statutory provision requires proof of an element that the other does not * * *."

*Id.* at 514 (emphasis in original). Thus, under the law as it now stands, petitioner would not in any event have been entitled to an instruction on the lesser crime.

[12] Petitioner testified in the penalty phase of his criminal trial.

separately argues that his trial counsel was inadequate by reason of his failure to ensure that petitioner's waiver of an instruction concerning his failure to testify was knowing.[13]

The state responds that the record supports the post-conviction court's finding that petitioner's criminal trial counsel decided not to request a jury instruction concerning petitioner's failure to testify because trial counsel "generally [did] not want to emphasize the fact that [petitioner] did not take the stand." The state also contends that, consistently with *State v. Lakeside*, 277 Or 569, 561 P2d 612 (1977), *aff'd sub nom, Lakeside v. Oregon*, 435 US 333, 98 S Ct 1091, 55 L Ed 2d 319 (1978), a decision not to request such an instruction is reasonable and that, in this case, petitioner was not prejudiced because the jury "heard his version of events" through his statements to the police and through his video-taped reenactment of the crime. As to petitioner's separate argument regarding trial counsel's purported failure to ensure that he knowingly waived the giving of the instruction, the state asserts that petitioner failed below and fails on appeal to develop that argument, including advancing no authority to support it, and that this court therefore should reject it.

First, we agree that the record supports the post-conviction court's finding that petitioner's criminal trial counsel made a tactical choice not to request the instruction. Counsel expressly told the trial court that he "belong[ed] to the school of thought that says you shouldn't mention" a defendant's failure to testify. Nor was that tactical choice unreasonable. In particular, we reject defendant's categorical reasoning that giving the instruction can never have an adverse effect. In *State v. Larson*, 325 Or 15, 933 P2d 958 (1997), the Supreme Court explained that a prosecutor's comment regarding the defendant's failure to testify violates the constitutional right to remain silent if it is likely that the comment caused the jury to draw an adverse inference as to the defendant's guilt or innocence. *Id.* at 23-24. The court also

---

[13] In his fifth assignment of error, petitioner also challenges the criminal trial court's purported failure to assure that he personally waived his right to testify. As previously stated, that claim of error is barred under *Palmer*, 318 Or at 358.

noted that that likelihood is increased when the comment is specifically directed to the jury, rather than to the judge. *Id.* at 24-25. The court may, of course, caution the jury not to draw such an inference. *Id.* at 23. Nevertheless, as the *Larson* court implicitly recognized, directing a jury's attention to a defendant's failure to testify can indeed have an adverse effect. Thus, declining to request an instruction on a defendant's failure to testify can indeed constitute a reasonable tactical choice on the part of trial counsel.

Moreover, in this case, it is unlikely that the absence of an instruction regarding petitioner's failure to testify caused the jury to draw an adverse inference. Where the jury heard petitioner's version of the events surrounding the murder by way of his statements to the police and his videotaped enactment, the lack of a cautionary instruction regarding petitioner's failure personally to testify in the guilt phase of the trial was of minimal significance.

 Finally, we also reject petitioner's contention that a criminal defendant is constitutionally entitled to a failure-to-testify instruction. Petitioner has identified no authority for that proposition; nor have we.[14] Accordingly, we decline to hold that petitioner's trial counsel was inadequate by reason of failing to ensure that petitioner "personally" waived that purported right.

In sum, petitioner's fifth assignment of error fails.

 In his sixth assignment of error, petitioner asserts that trial counsel was inadequate by reason of failing to "preserve a record of whether petitioner was justifiably in leg

---

[14] In *State v. Johnson*, 88 Or App 185, 744 P2d 600 (1987), this court reiterated that, when the defendant has requested a jury instruction concerning the defendant's right not to testify, the failure to give such an instruction is reversible error. At the same time, it is *not* necessarily reversible error to give such an instruction over the defendant's objection. *See Lakeside*, 277 Or at 588, 588 n 10 (giving the instruction over the defendant's objection is not necessarily error, for example by reason of interfering with the strategy of the defendant's counsel; noting, rather, that "it would be better practice not to give such an instruction unless it is requested" by the defendant). Neither of those propositions means, however, that, as a matter of law, a defendant's trial counsel necessarily fails to exercise reasonable professional skill and judgment by declining to request such an instruction or that giving the instruction is a constitutional right that the defendant must knowingly waive.

irons throughout the trial" and in failing to request a hearing regarding the necessity of keeping petitioner in leg irons.[15] In petitioner's criminal trial, before the state presented its case, the trial court noted outside the presence of the jury that it understood that petitioner "refuses to wear a leg brace. If he won't wear the leg brace I have prescribed for him th[e]n I will have him put in leg irons." Petitioner's trial counsel responded, "I thought that's what we had agreed to." The court continued, "Because he has already been charged, as I understand, [with] trying to escape from jail and also been charged with assaulting another prisoner."[16] Later, at the close of the state's case in the guilt phase of petitioner's criminal trial, the trial court stated outside the presence of the jury that

> "we have a problem of course with the leg chain on [petitioner], which if he takes the stand and testifies, since that isn't visible now, could be visible to [the jury] and there was some discussion about that earlier and about the defendant not desiring to have any of kind of hearing and accepting that."

Petitioner's counsel responded that "the easiest way to handle that" would be for petitioner to take the stand before the jury returned to the courtroom. On the second day of the penalty phase of petitioner's criminal trial, the court referred to a hearing that "was never completed. This was a hearing we started whether or not the restraints would be appropriate." At the time petitioner testified in the penalty phase, the jury was removed from the courtroom so that petitioner could take the stand without the jury seeing his restraints. At none of the described points during petitioner's trial did he or his

---

[15] Petitioner's sixth assignment of error also encompasses one of his challenges to an action of the criminal trial court that as previously noted, is barred under *Palmer*.

[16] In the penalty phase of petitioner's criminal trial, several Douglas County corrections officers testified regarding petitioner's conduct in the jail before his criminal trial, including yelling, cursing, and pounding on windows. One officer testified that he had discovered a razor blade and "another small metal item" that "could be used as a file" in petitioner's jail cell and that petitioner had been charged with a "major [disciplinary] violation" for that contraband, as well as with "an assault." A former inmate in the jail testified that he had been housed in the same cell block as petitioner and that, on one occasion, petitioner had hit him three or four times in the face, resulting in a bone fracture, bruises, and stitches.

counsel request any further hearing on the issue of his restraints.

In his deposition in the post-conviction proceeding, petitioner testified that, after he had refused to wear a leg brace because it irritated his knee, "they put some leg irons on me, kind of like * * * handcuffs but the chain was longer * * *. They just taped them up so they wouldn't make noise." When asked whether counsel had ever informed him that he "had the right to have a hearing about whether you had to be in chains in the courtroom," petitioner responded that counsel had not specifically asked him if he wanted a hearing but that counsel had asked, "Are you all right with just wearing the handcuffs around the ankles with the tape?" and that he had responded, "Sure."

The post-conviction court found that the trial court had not conducted a hearing on the issue of whether petitioner should be restrained during his trial because petitioner had "volunteered to wear ankle shackles that were taped so they made no noise; petitioner wanted to avoid wearing the leg brace restraint." The post-conviction court also found that, although the trial court did not conduct a hearing on the issue of restraining petitioner, the record of the criminal trial included several "incidents" that supported a finding that petitioner should be physically restrained, including an attempted escape from jail while awaiting trial and several incidents of assaultive, abusive, threatening, or other prohibited behavior while detained before trial.

On appeal, petitioner argues that the record shows that his criminal trial counsel failed to object to his being restrained during trial; that, under *Davis v. Armenakis*, 151 Or App 66, 948 P2d 327 (1997), *rev den*, 327 Or 83 (1998), where no record is made to support a shackling decision prejudice must be presumed; that, under federal law, shackling is permissible only to fulfill an "essential state interest"; and that his counsel therefore rendered inadequate assistance under both Article I, section 11, and the Sixth Amendment. The state responds that the record of petitioner's criminal trial supports the finding that shackling was justified and demonstrates that petitioner agreed to wear leg irons and to discontinue any hearing on the matter.

 A post-conviction petitioner establishes a *prima facie* case of inadequate assistance of criminal trial counsel by showing that the petitioner was shackled in the presence of the jury during his or her criminal trial and that no record was made in the trial court to support the decision to shackle. *Guinn v. Cupp*, 304 Or 488, 498, 747 P2d 984 (1987). Counsel's deficiency in that regard is not prejudicial, however, where the presence of shackles or other restraints is harmless beyond a reasonable doubt. *See Davis*, 151 Or App at 72 (applying constitutional harmless error standard to prejudice inquiry in post-conviction proceeding arising from counsel's failure to object to shackling). Criminal trial counsel's error regarding shackling is harmless beyond a reasonable doubt when, for example, "the evidence of [the post-conviction] petitioner's guilt was overwhelming, rendering counsel's default nonprejudicial." *Barker v. Baldwin*, 179 Or App 142, 143, 38 P3d 962 (2002).

Here, petitioner has not made a *prima facie* showing that his criminal trial counsel was deficient. First, the criminal trial record supports the decision to restrain him by use of leg irons, including the trial court's observation that petitioner had been "charged" with attempting to escape from the jail and with assaulting another inmate. Accordingly, trial counsel did not fail to "preserve a record" on that issue. In addition, the record—including not only petitioner's trial counsel's remarks to the trial court quoted above but also petitioner's own deposition testimony in the post-conviction hearing—demonstrates that petitioner agreed to be restrained. It follows that petitioner's trial counsel did not fail to exercise reasonable skill and judgment by not requesting further proceedings on that issue. Petitioner's sixth assignment of error is unavailing.

 In his seventh assignment of error, petitioner argues that his criminal trial counsel was inadequate by reason of failing to argue that the toilet tissue found between the victim's legs was evidence that she and petitioner had had consensual sex. As relevant to that assignment, the post-conviction court found that there was blood, but no seminal fluid, on the toilet tissue; that other toilet tissue was present at the scene; that the pathologist, Brady, had testified at petitioner's criminal trial that he had never seen a case in which,

after raping and murdering the victim, the assailant "cleaned up" the victim's genital area with toilet tissue; and that, based on Brady's testimony, petitioner's criminal trial counsel had argued that the victim had cleaned herself up after having sex with petitioner, indicating that she had had consensual sex with him.

On appeal, petitioner argues that his trial counsel's performance was inadequate because he failed specifically to mention in closing argument the toilet tissue found between the victim's legs. The state responds that, because petitioner does not challenge the post-conviction court's findings, he has not presented any legal issue for this court to decide and that, in any event, petitioner's criminal trial counsel could not reasonably have argued that the toilet tissue found between the victim's legs was used by her to "clean up" after consensual sex because petitioner's theory in his criminal trial was that he had had consensual sex with the victim at a location other than the one where she was killed.

The post-conviction court's findings are supported by the evidence in the record. In addition, petitioner's criminal trial counsel was not inadequate by reason of failing specifically to mention the toilet tissue in closing argument. Trial counsel's decision to argue merely that the victim "cleaned herself up" after having sex with petitioner, rather than specifically asserting that she cleaned herself up with the toilet tissue found near her body, was consistent with petitioner's theory of his defense—that the consensual sex occurred at another location. As such, that decision constituted a tactical choice based on reason and professional judgment. *See Lambert*, 182 Or App at 134-36 (trial counsel made a reasonable tactical choice not to raise an alternative theory of self-defense that was inconsistent with the petitioner's own testimony in his criminal trial and that therefore would have undermined the petitioner's credibility regarding his primary defense theory, that his conduct occurred accidentally); *Pachl v. Zenon*, 145 Or App 350, 359, 929 P2d 1088 (1996), *rev den*, 325 Or 621 (1997) ("It behooves any trial counsel to present a consistent defense throughout a jury trial, given the weaknesses and opportunities for attacks by an opponent that inconsistent * * * positions provide."; where counsel's decision not to move for a mistrial was consistent with his

overall trial strategy, the post-conviction petitioner failed to demonstrate that counsel's decision deviated from the standard of reasonable professional judgment); *see also Krummacher*, 290 Or at 877-81 (defense counsel made a reasonable tactical choice in focusing on the weaknesses in the state's evidence and in declining to develop more strongly an alternative theory of defense that would itself have been susceptible to attack by the state). We reject petitioner's seventh assignment of error.

In his ninth assignment of error, petitioner argues that his criminal trial counsel rendered inadequate assistance in two respects relating to the prosecutor's closing argument in the penalty phase of his trial. Petitioner first argues that counsel was inadequate by reason of failing to object to a purported comment by the prosecutor on petitioner's right to remain silent. As pertinent to that argument, in the penalty phase of petitioner's criminal trial, a licensed clinical psychologist, Dr. Wise, testified that, based on psychological tests he had administered to petitioner, he believed that petitioner suffered from "moderate to severe" frontal lobe dysfunction that caused him to have difficulty controlling his impulses;[17] that he attributed petitioner's dysfunction to an organic brain or head injury; and that the causes of such an injury could include a fight, bumping a windshield, receiving a whiplash injury, or playing "aggressive rough football." In her closing argument in the penalty phase, the prosecutor, Champion, argued:

> "Let's examine Dr. Wise's testimony. There is a temptation to assume there is some sort of link between what he finds to be brain damage and what happened to [the victim] and I submit to you that there is not a connection. And here is why.
>
> "He tells you that loss of brain cells and brain injuries is not unusual. Happens to a lot of people every year. If it happened to this Defendant wouldn't you expect to have seen something before now? Wouldn't you have expected that you would have heard *testimony from somebody that said he*

---

[17] Wise explained that petitioner's actual diagnosis was "frontal lobe syndrome," a form of "organic personality syndrome"; he also diagnosed petitioner as suffering from antisocial personality disorder and alcohol abuse.

*was hit in the head or someone that said he went to the doctor or someone who said he exhibited something*. That he did it under ordinary circumstances rather than having an individual that is under control when he wants to be."

(Emphasis added.) The post-conviction court found that Champion's remarks were not a comment on petitioner's failure to testify during the guilt phase but were a nonobjectionable argument on the weight the jury should give Wise's testimony.

In this court, petitioner argues that his criminal trial counsel was inadequate for failing to object to the prosecutor's argument because the jury could have drawn prejudicial inferences from the argument, thereby rendering "meaningless" petitioner's constitutional right to remain silent. The state responds that Champion was not referring to petitioner's failure to testify but to the absence of testimony or evidence from other sources about the occurrence of a brain injury to petitioner and that such comment was permissible here because it was consistent with the evidence in the case. The state also argues that, even assuming that Champion was commenting on petitioner's failure to testify, that comment did not prejudice petitioner because petitioner did in fact testify in the penalty phase.

Under Article I, section 12, of the Oregon Constitution and the Fifth Amendment to the United States Constitution, a criminal defendant has a right to remain silent and a prosecutor may not draw the jury's attention to the defendant's exercise of that right. *Larson,* 325 Or at 22-23. In *State v. White,* 303 Or 333, 342, 736 P2d 552 (1987), the Supreme Court reiterated that informing a jury that a defendant has exercised his or her right to remain silent is "likely to prejudice the defendant's right to a fair trial," that is, has a "presumably harmful effect" that properly must be remedied by, for example, a proper instruction or, if a lesser remedy is inadequate, by granting a motion for mistrial.

We assume, for purposes of this discussion only, that petitioner's "right to remain silent" is implicated despite the fact that he actually testified in the penalty phase proceeding. However, we do not understand the prosecutor's

remarks, quoted above, to constitute an impermissible comment on that right. Rather, fairly understood, those remarks constituted a permissible argument regarding Wise's testimony that petitioner suffered from frontal lobe dysfunction resulting from an organic brain injury—namely, the argument that Wise's testimony was entitled to little weight due to the absence of evidence that petitioner had been involved in incidents of the types that Wise had mentioned as possible causes of such injuries; evidence that petitioner had ever seen a doctor about such an injury; or evidence that petitioner had acted in a manner consistent with such an injury. Petitioner's "right to remain silent" was not contravened by that argument.

■ Petitioner's second argument in his ninth assignment of error is that his trial counsel was inadequate by reason of failing to object when, in her closing argument in the penalty phase, the prosecutor purportedly "berated" petitioner by arguing that he never expressed any remorse for his actions. As pertinent to that portion of petitioner's assignment of error, Champion argued to the penalty phase jury that petitioner

"doesn't feel sorry. He tried to tell you on the stand he felt sorry the other day but he told his mother right after this crime he had no remorse for killing the [victim].

"Did he ever say he was sorry about anything? Did he say he was sorry he threatened his mother, sorry he raped his sister, sorry he did this to [a witness who testified in the penalty phase that petitioner had forced her to perform oral sex on him and had committed forcible anal sex on her, resulting in physical injuries], sorry he did this to [a witness who testified in the penalty phase that petitioner had choked her, had had forcible sex with her, had threatened her two-year-old child, and had put his fist through the window of her car]? No."

The post-conviction court found that the prosecutor's argument that petitioner had showed no remorse "related to petitioner's lack of a conscience" and that the prosecutor had "directly tied that personality feature" to petitioner's potential for future dangerousness, as relevant under ORS 163.150(1)(b)(B). The court determined that the prosecutor's argument was "unobjectionable."

In this court, petitioner argues that whether he was "sorry" is "irrelevant" to whether he should receive a death sentence; that the prosecutor's comments amounted to berating him, calling him a liar, or otherwise adversely characterizing him to the jury, again to the detriment of his right to remain silent; and that his criminal trial counsel was inadequate by failing to object to that conduct. The state responds that Champion's argument was permissible because it directed the jury's attention to evidence contravening petitioner's own testimony that he was sorry for killing the victim and because it commented on evidence—petitioner's lack of remorse—that was relevant to the question of petitioner's future dangerousness.

ORS 163.150(1)(b)(B) requires that a jury in a death penalty case determine "[w]hether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." That question, ordinarily referred to as the "future dangerousness" question, makes relevant a broad range of evidence that is probative of whether a defendant is likely to engage in dangerous criminal conduct in the future, including evidence of a defendant's entire previous criminal history (including nonviolent crimes); evidence of the defendant's unadjudicated prior bad acts; and, most pertinent here, evidence of the defendant's previous "bad character." *See State v. Moore*, 324 Or 396, 416, 927 P2d 1073 (1996) (citing, among other cases, *State v. Williams*, 322 Or 620, 632, 912 P2d 364, *cert den*, 519 US 854 (1996) (*Williams II*), and *State v. Smith*, 310 Or 1, 29, 791 P2d 836 (1990)); *see also State v. Moen*, 309 Or 45, 76, 786 P2d 111 (1990). Evidence of a defendant's lack of remorse is one sort of evidence of "bad character" and thus is admissible as relevant to the jury's inquiry under ORS 163.150(1)(b)(B). *See State v. Guzek*, 310 Or 299, 307, 797 P2d 1031 (1990) (evidence was sufficient to permit jury to conclude that the defendant was a "remorseless" killer who would commit other crimes of violence; trial court therefore properly submitted "future dangerousness" question to jury). It follows, in turn, that, where the state has presented evidence of a defendant's bad character—specifically, his lack of remorse—pursuant to ORS 163.150(1)(b)(B), the prosecutor may argue the significance of such evidence. *See State v. Bockorny*, 124 Or App

585, 594-95, 863 P2d 1296 (1993), *rev den*, 318 Or 351 (1994) (prosecutor's argument in penalty phase of aggravated murder trial was permissible, as it consisted of an explanation of possible ways the jury could view the evidence).

Here, consistently with the above principles, the prosecutor properly could argue that petitioner's lack of remorse demonstrated his bad character and therefore his propensity to "future dangerousness." Moreover, the argument properly responded to petitioner's own evidence that he was sorry for killing the victim. *See State v. Compton*, 333 Or 274, 294, 39 P3d 833, *cert den*, ____ US ____ , 123 S Ct 165, 154 L Ed 2d 64, *reh'g den*, ____ US ____ , 123 S Ct 653, 154 L Ed 2d 559 (2002) (prosecutor's argument was permissible because, among other reasons, it responded to the defendant's contention pertaining to the question, under ORS 163.150(1)(b)(A), whether he had acted deliberately). Because the prosecutor's argument relating to petitioner's lack of remorse was not improper, petitioner's trial counsel was not inadequate for failing to object to it.[18]

We turn to petitioner's tenth assignment of error, in which he argues that his trial counsel was inadequate by failing to impeach a witness, Dr. Cochran, for his "licensing and reputation problems" which, petitioner asserts, would have affected the jury's verdict. As relevant to that assignment, Cochran, a forensic clinical psychologist at the Oregon State Hospital, testified in the penalty phase of petitioner's criminal trial that he had reviewed the autopsy report and the police investigation reports in petitioner's case, as well as petitioner's previous juvenile and criminal records. Cochran had formed the opinion (relevant to the question of petitioner's future dangerousness) that petitioner "would enact crimes of violence in the future that would act as a continuing threat to society." Later in the penalty phase, after Wise had testified as described in the previous assignment of error,

---

[18] We do not view the prosecutor's argument pertaining to petitioner's lack of remorse as a comment on petitioner's right to remain silent given that petitioner did not, in fact, remain silent about "remorse" but offered testimony on the subject. We therefore do not address that portion of his challenge to that argument.

Cochran returned to the witness stand and testified regarding frontal lobe dysfunction and other matters to which Wise had testified.

In the post-conviction proceeding, petitioner adduced evidence that, in 1994, a defendant in another aggravated murder case had attempted to impeach Cochran's testimony in that case by challenging his qualifications and expertise by means of evidence derived from records maintained by the Board of Psychologist Examiners (the board), the agency that licensed Cochran. The records included a letter from a former employer of Cochran indicating that he would not rehire Cochran and stating his reasons therefor; a letter from the board to Cochran criticizing Cochran's conduct in regard to a client who was seeking executive clemency; a record indicating that, when Cochran first applied for a license, a committee of the board voted not to pass him on an oral examination component of the application; and a 1990 notice by the board of its proposed suspension of Cochran's license on the ground that testimony by Cochran in other specified judicial proceedings had violated certain applicable ethical principles.[19] The state presented evidence in the post-conviction hearing that the defendant in the 1994 case, McDonnell, had been convicted and sentenced to death. The post-conviction court found that petitioner was not prejudiced by his criminal trial counsel's failure to make a similar attempt to impeach Cochran because, at the time of petitioner's trial, Cochran was licensed by the board and the board's investigation of his alleged ethical violations had not been resolved; and because Cochran had been easily rehabilitated by the prosecutor in the 1994 case, resulting in the defendant in that case receiving the death penalty notwithstanding his attempted impeachment of Cochran.

On appeal, petitioner argues that trial counsel's failure to impeach Cochran, based on what he asserts was available evidence at the time of his criminal trial, amounted to a failure adequately to investigate his defense. Petitioner also argues that he was prejudiced by that failure because

---

[19] The records were entered in evidence in the 1994 trial as part of the defendant's offer of proof regarding the admissibility of Cochran's answers to questions about the events described in the records.

Cochran was an "important" witness whose testimony in the penalty phase regarding petitioner's future dangerousness "undoubtedly influenced" the jury and therefore clearly had a tendency to affect the result of his trial. The state responds that the record of the 1994 criminal trial on which petitioner relies demonstrates that the defendant in that trial was not able to impeach Cochran successfully. According to the state, nothing about the status of Cochran's license at the relevant time suggested that he was not a qualified expert, and his "self-described efforts to keep dangerous criminals locked up would almost certainly appeal to many jurors." The state argues that petitioner therefore was not prejudiced.[20]

 The post-conviction court's findings are supported by evidence in the record. In addition, we conclude that, even assuming that petitioner's criminal trial counsel failed to investigate and present at trial possible impeachment evidence concerning Cochran and that counsel's performance therefore did not meet the constitutional standard for a reasonable exercise of professional skill and judgment, petitioner did not demonstrate that he was prejudiced. In the 1994 criminal trial, Cochran contested the significance of the defendant's attempted impeachment evidence.[21] Nor do we view the attempted impeachment evidence, as ultimately presented to the jury at the 1994 trial and in light of Cochran's testimony in that trial explaining and refuting it, as necessarily tending to affect a jury's verdict. *See Horn*, 180 Or App at 148 (whether a criminal defense counsel's failure to investigate, discover, or adduce evidence had a tendency to affect the outcome of a case must be assessed in light of the totality of the circumstances). Finally, as the record of the post-conviction proceeding demonstrates,[22] the jury in the

---

[20] The state does not argue that petitioner's criminal trial counsel made a conscious tactical decision not to attempt to impeach Cochran.

[21] Cochran also testified in the 1994 criminal trial that he understood the Board of Psychologist Examiners records relied on by the defendant in attempting to impeach him to be confidential and that he was "answering questions" based on those records only because he was "required to do so." We do not address here the question whether Board of Psychologist Examiners records are confidential for any particular purpose.

[22] Counsel for the defendant in whose 1994 criminal trial Cochran's qualifications were challenged testified in petitioner's post-conviction hearing that his client received the death penalty despite the attempt to impeach Cochran, and the defendant's judgment of conviction and sentence was received in evidence.

1994 case sentenced the defendant to death in spite of his attempt to impeach Cochran. For all of those reasons, this is not a case like *Loveless v. Maass*, 166 Or App 611, 999 P2d 537 (2000), in which the evidence that the post-conviction petitioner's criminal trial counsel had failed to adduce would likely have impeached the credibility of the key witness (who was also the victim) in, and therefore had a tendency to affect the result of, the petitioner's criminal trial. Petitioner's tenth assignment of error fails.

In his eleventh assignment of error, petitioner argues that his criminal trial counsel was inadequate by failing adequately to communicate to petitioner a purported plea offer from the prosecutor and failing adequately to explain to him the consequences of a plea agreement. In the post-conviction proceeding, petitioner's criminal trial counsel testified that he recalled a pretrial conversation with the prosecutor, the "precise timing" of which he was "fuzzy on," in which the prosecutor "said something like this is your last chance; take life without parole and do it before we go further. That's not the precise words but it was the import of what I was told." Trial counsel testified that he and petitioner had "chatted about" the purported offer for "a short while," perhaps 15 or 20 minutes, and that petitioner had indicated that he was not "greatly interested" in a plea offer because he believed the jury would not convict him of raping the victim. The prosecutor testified by deposition in the post-conviction proceeding that "I did not make [petitioner] an offer of true life."

The post-conviction court found that the prosecutor "did not make a last-minute offer for petitioner to plead guilty to Aggravated Murder in exchange for a sentence of life without parole. The court is not persuaded by the vague, uncertain testimony given by [petitioner's criminal trial counsel] * * *." Those findings are supported by evidence in the record. Where the record shows that the prosecutor did not make an offer of life without parole, it follows that petitioner's criminal counsel was not inadequate for failing to communicate such an offer to petitioner.

In his twelfth assignment of error, petitioner argues that his criminal trial counsel was inadequate because he

requested a jury instruction that incorrectly stated the defi-
nition of criminal acts of violence for the purpose of the
question of petitioner's future dangerousness under ORS
163.150(1)(b)(B). In the penalty phase of petitioner's criminal
trial, petitioner's trial counsel, relying on *State v. Huntley*,
302 Or 418, 730 P2d 1234 (1986), requested that the trial
court instruct the jury that " '[c]riminal acts of violence'
refers to a relatively narrow range of acts characterized by
the application or overt threat of force which have the poten-
tial for inflicting bodily injury on another person." Counsel
argued that the requested instruction was intended to pre-
clude consideration of acts that were "not directed against
individuals" but were merely property crimes. The state
agreed to the giving of the instruction on the condition that
the words "relatively narrow range of acts" were removed.
The trial court instructed the jury:

> "The second question asked by the law is[,] is there a
> probability meaning is it more likely than not that [peti-
> tioner] would commit criminal acts of violence that would
> constitute a continuing threat to society.

> "Criminal acts of violence are acts characterized by the
> application of force or the open threat of force having the
> potential of inflicting bodily injury on another person."

In the post-conviction hearing, petitioner argued
that trial counsel's requested definition of "criminal acts
of violence" was inadequate because it was taken from a
case involving the application of the dangerous offender
statute, ORS 161.625 to ORS 161.637, rather than ORS
163.150(1)(b)(B). According to petitioner, the former statute
is concerned with current dangerousness, while the latter is
concerned with future dangerousness. Petitioner also argued
that the instruction erroneously included, as acts of criminal
violence, mere threats. He argued that he was prejudiced
because the instruction allowed the jury to answer the second
death penalty question "without proof of actual violence per-
petrated by petitioner."[23] The post-conviction court found

---

[23] In the post-conviction hearing, in addition to the record of the penalty phase
proceeding—showing petitioner's requested instruction, his criminal trial coun-
sel's argument relating to it, and the instruction given by the trial court—peti-
tioner presented the testimony of his criminal trial counsel, in which counsel stated
that his purpose in requesting the jury instruction was to "narrow the jury's

that counsel had requested that jury instruction, that the court gave it over the prosecutor's objection, and that it constituted a "narrower definition of 'criminal acts of violence' than the Oregon Supreme Court has held should be given."

On appeal, petitioner repeats his legal arguments made below. The state responds that, consistently with *State v. Tucker*, 315 Or 321, 336-37, 845 P2d 904 (1993), and related cases, when answering the second death penalty question, the jury properly can consider a broad range of prior criminal conduct, including threats.

As discussed above, ORS 163.150(1)(b)(B) makes relevant a broad range of evidence. *See Smith*, 310 Or at 29 ("We consistently have held that ORS 163.150(1) * * * is to be interpreted broadly * * *."). As particularly pertinent here, in *State v. Williams*, 313 Or 19, 828 P2d 1006, *cert den*, 506 US 858 (1992) (*Williams I*), witnesses testified in the penalty phase of the defendant's trial for aggravated murder that, in the context of the defendant's activities related to drug dealing, the defendant had "burned people's houses and cars, threatened them with guns, and threatened to kill them * * *." *Id.* at 43. The court concluded that that evidence "bore directly on the issue of future dangerousness" under ORS 163.150(1)(b)(B). *Id.* The court also found relevant a statement by the defendant that he "would like to rape a 'girl.' " *Id.*

Consistently with *Williams I*, the jury instruction at issue here was not erroneous on the ground asserted by petitioner—that it permitted the jury to consider, as "acts of criminal violence," mere threats. Accordingly, petitioner's trial counsel was not inadequate by requesting that instruction.

In his fourteenth assignment of error, petitioner argues that trial counsel was inadequate by failing to conduct an adequate "proportionality review" of the process used by the Douglas County prosecutor in making charging and sentencing decisions.[24] In petitioner's criminal trial, counsel

consideration" to "relatively serious" acts resulting in "injury to a particular person," rather than mere threats or acts resulting in injury to other than persons; and that he now understood that the requested instruction had the "[e]xactly opposite" effect.

[24] The Supreme Court has indicated that the term "proportionality review" is not the proper term for identifying the inquiry at issue. *State v. Reyes-Camarena*, 330 Or 431, 438 n 3, 7 P3d 522 (2000); *Cunningham*, 320 Or at 64 n 16.

moved to require the state to produce information regarding the imposition of the death penalty throughout the state for the purpose of determining whether petitioner was unfairly denied a particular plea or sentence offer. The state voluntarily produced the information for Douglas County and the trial court denied the motion for information from other counties. On direct review, the Supreme Court held that petitioner was not entitled to statewide information under Article I, section 20, or the Eighth or Fourteenth Amendment. The court noted that petitioner did not argue on appeal that he was treated differently from other similarly situated defendants in Douglas County. *Cunningham*, 320 Or at 64-69.[25]

In the post-conviction proceeding, Champion testified by deposition regarding her office's standards and policies for seeking the death penalty. She testified that the district attorney's office charged a crime as aggravated murder "whenever all the elements were there." As to whether to seek the death penalty in a particular case, the prosecutor testified that her office conducted a penalty phase investigation in which it evaluated the defendant's "background for violence" and assessed, in light of its prior death penalty cases, "whether we could prove the questions involved." The post-conviction court found that trial counsel did not attempt to conduct a "proportionality review" for Douglas County; that the charging and penalty decisions made by Douglas County in petitioner's case were "part of a coherent, systematic policy"; and that petitioner did not present any evidence to show that the district attorney treated him any differently than other similarly situated defendants.

On appeal, petitioner argues that the prosecutor's deposition testimony demonstrates that Douglas County's policy is insufficient to pass muster under the Equal Protection Clause of the Fourteenth Amendment and that, had trial counsel adequately challenged that policy, that challenge would have succeeded. He also asserts that, consistently with *Bush v. Gore*, 531 US 98, 121 S Ct 525, 148 L Ed 2d 388 (2000), and contrary to decisions of the Oregon Supreme

---

[25] We take the stated facts pertaining to petitioner's criminal trial from the Supreme Court's decision in that case.

Court, both Article I, section 20, and the Fourteenth Amendment demand statewide standards, at a minimum, for charging and sentencing decisions and that his trial counsel was inadequate by reason of failing to pursue such a challenge. The state responds that the prosecutor's testimony demonstrates that Douglas County's processes were sufficient, that petitioner failed to show that he was in fact treated differently from other similarly situated Douglas County defendants, and that *Bush* is inapplicable because, unlike the statewide ballot-counting process at issue in that case, charging decisions are made at the county level.

 We agree with the state. Champion's testimony was more than adequate to demonstrate that the county made its charging and sentencing decisions in petitioner's case in a manner that was consistent with a coherent, systematic policy that, moreover, was not prompted by any impermissible discriminatory motive. Those decisions therefore were constitutionally sufficient under Article I, section 20, and the Equal Protection Clause. *See Tucker*, 315 Or at 327-28. In addition, petitioner did not present any evidence that he in fact was treated differently from similarly situated defendants in that county. Finally, *Bush* does not require a different result. In that case, the Court determined that the "statewide recount" process ordered by the Florida Supreme Court failed to meet the minimal requirements of equal treatment. It expressly noted, however, that it was *not* deciding "whether local entities, in the exercise in their expertise, may develop different systems for implementing [statewide] elections." 531 US at 109. Nothing in *Bush* suggests that it is improper for a county to develop and implement a particularized policy regarding the charging of state criminal offenses or that the county's policy pertaining to those decisions is not the proper subject of inquiry regarding the decision's constitutionality under the Equal Protection Clause. Petitioner's fourteenth assignment of error fails.

 In his fifteenth assignment of error, petitioner argues that his criminal trial counsel was inadequate when he failed to object to, or request additional time to investigate and obtain evidence to refute, the testimony of two witnesses in the penalty phase of his trial. The penalty phase of petitioner's criminal trial began on October 15, 1992. On October

14 and 15, the prosecutor gave defense counsel the names of two witnesses, Harris and Sherfield, whom the state had just identified or interviewed.[26] On the morning of October 15, petitioner's trial counsel moved to exclude the testimony of those witnesses. The trial court noted that the penalty phase would be continuing for "some time," during which petitioner could investigate the witnesses, and ruled that petitioner's motion was "premature."

Harris ultimately did not testify in the penalty phase. Sherfield testified that she had met petitioner in 1985 and that, in October 1986, petitioner pushed her down, choked her, and had forcible sex with her in the bedroom of his apartment; that he told her not to tell anyone; and that, on another occasion, he put his fist through the window of her car.

In the post-conviction proceeding, petitioner presented the affidavit of Harris, in which Harris averred that she was present in the apartment at the time that petitioner allegedly had forcible sex with Sherfield and that, after petitioner and Sherfield came out of the bedroom, Sherfield was "acting normal and laughing" and did not say anything that would have caused Harris to believe that she had been abused or raped. The state presented the police investigator's report of his October 14, 1992, telephone interview with Harris, in which Harris asserted that, six or seven years earlier, when she was 16 years old, petitioner had pushed her to the ground, tried to rape her, and choked and threatened her. Harris also asserted that, on another occasion, petitioner had tried to "strangle" her.

The post-conviction court found that trial counsel had moved to exclude the testimony of Harris and Sherfield; that, during petitioner's criminal trial, Harris told a police investigator that petitioner had attacked and choked her; that Harris's affidavit prepared for the post-conviction proceeding, containing evidence that contravened Sherfield's penalty phase testimony, did not demonstrate that Harris

---

[26] In his petition for post-conviction relief, petitioner alleged that his trial counsel failed to obtain evidence to impeach Sherfield and another witness, Willis. However, in essence, petitioner's argument based on that allegation is that counsel failed to investigate Harris in regard to evidence impeaching Sherfield.

had told anyone about that evidence during petitioner's criminal trial; and that petitioner's trial counsel therefore was not aware of that contravening evidence at that time.

On appeal, petitioner concedes that he cannot conclusively establish that Harris would have testified at his criminal trial consistently with the impeaching information contained in her affidavit in his post-conviction proceeding. He argues that his trial counsel nevertheless was obligated to investigate Harris and Sherfield and to request a continuance to do so, that the trial court would have been obligated to grant a request for time to do so, and that petitioner was prejudiced by his counsel's failure in those regards because the "date rape"-type evidence provided by Sherfield (as well as by Price Willis) likely affected the jury's answer to the question of petitioner's future dangerousness. The state responds that, even without a continuance, petitioner's trial counsel had seven days between the beginning of the penalty phase and the presentation of petitioner's evidence. The state also argues that, even if trial counsel had discovered it, the information in Harris's affidavit would not have significantly impeached Sherfield's testimony; and that, in any event, if Harris had testified, it would have opened the door to testimony about petitioner's conduct toward her, as disclosed to the police investigator.

We conclude that a reasonable exercise of professional skill and judgment did not require trial counsel further to investigate Harris. Again, at the time of petitioner's criminal trial, Harris gave inculpatory information about petitioner to a police investigator, information that the prosecutor then provided to petitioner's trial counsel. Trial counsel had no reason to know that Harris may have had other information that was favorable to petitioner. Nor, after the state declined to call Harris, could counsel reasonably be expected to call her as a witness. Indeed, even assuming that, if questioned about Sherfield, Harris would have testified in petitioner's criminal trial in a manner that was consistent with her affidavit in the post-conviction proceeding, the value of that testimony to petitioner would have been substantially negated by the state's likely elicitation from Harris of testimony regarding petitioner's assault and attempted rape of her. Petitioner's fifteenth assignment of error fails.

Petitioner's remaining assignments of error do not require discussion, and we reject them. Because petitioner's criminal trial counsel was not inadequate for any of the reasons asserted by petitioner, the post-conviction court did not err in denying post-conviction relief.

Affirmed.