On appellant's petition for reconsideration filed March 27, reconsideration allowed; opinion modified and adhered to as modified June 12, 2003

CLINTON WENDELL CUNNINGHAM,
*Appellant,*

*v.*

S. Frank THOMPSON,
Superintendent,
Oregon State Penitentiary,
*Respondent.*

95C-11416; A107806

71 P3d 110

Eric M. Cumfer for petition.

Before Landau, Presiding Judge, and Deits, Chief Judge, and Brewer, Judge.

BREWER, J.

## BREWER, J.

Petitioner seeks reconsideration of our decision affirming the post-conviction court's denial of his petition for post-conviction relief. *Cunningham v. Thompson*, 186 Or App 221, 62 P3d 823 (2003). Specifically, he seeks reconsideration of his tenth assignment of error, pertaining to his criminal trial counsel's failure to impeach the testimony, in the penalty phase of petitioner's criminal trial, of a psychologist, Dr. Cochran.[1] We allow the petition, modify our opinion, and adhere to it as modified.

For convenience, we set out in full our discussion, in our opinion, of petitioner's tenth assignment of error.

"We turn to petitioner's tenth assignment of error, in which he argues that his trial counsel was inadequate by failing to impeach a witness, Dr. Cochran, for his 'licensing and reputation problems' which, petitioner asserts, would have affected the jury's verdict. As relevant to that assignment, Cochran, a forensic clinical psychologist at the Oregon State Hospital, testified in the penalty phase of petitioner's criminal trial that he had reviewed the autopsy report and the police investigation reports in petitioner's case, as well as petitioner's previous juvenile and criminal records. Cochran had formed the opinion (relevant to the question of petitioner's future dangerousness) that petitioner 'would enact crimes of violence in the future that would act as a continuing threat to society.' Later in the penalty phase, after [another psychologist, Dr.] Wise had testified * * * Cochran returned to the witness stand and testified regarding frontal lobe dysfunction and other matters to which Wise had testified.

"In the post-conviction proceeding, petitioner adduced evidence that, in 1994, a defendant in another aggravated murder case had attempted to impeach Cochran's testimony in that case by challenging his qualifications and

---

[1] Petitioner argues that reconsideration of his tenth assignment of error is warranted under ORAP 6.25(1)(d) and (e). According to petitioner, this court's decision in *Harris v. Morrow*, 186 Or App 29, 63 P3d 581 (2003), which was decided a week before our original decision in this case, constituted a change in the law pertaining to the "prejudice" prong of the test for inadequate assistance of counsel; he also asserts that we erred in concluding that he was not prejudiced under the test enunciated in *Harris*.

expertise by means of evidence derived from records maintained by the Board of Psychologist Examiners (the board), the agency that licensed Cochran. The records included a letter from a former employer of Cochran indicating that he would not rehire Cochran and stating his reasons therefor; a letter from the board to Cochran criticizing Cochran's conduct in regard to a client who was seeking executive clemency; a record indicating that, when Cochran first applied for a license, a committee of the board voted not to pass him on an oral examination component of the application; and a 1990 notice by the board of its proposed suspension of Cochran's license on the ground that testimony by Cochran in other specified judicial proceedings had violated certain applicable ethical principles.[19] The state presented evidence in the post-conviction hearing that the defendant in the 1994 case, McDonnell, had been convicted and sentenced to death. The post-conviction court found that petitioner was not prejudiced by his criminal trial counsel's failure to make a similar attempt to impeach Cochran because, at the time of petitioner's trial, Cochran was licensed by the board and the board's investigation of his alleged ethical violations had not been resolved; and because Cochran had been easily rehabilitated by the prosecutor in the 1994 case, resulting in the defendant in that case receiving the death penalty notwithstanding his attempted impeachment of Cochran.

"On appeal, petitioner argues that trial counsel's failure to impeach Cochran, based on what he asserts was available evidence at the time of his criminal trial, amounted to a failure adequately to investigate his defense. Petitioner also argues that he was prejudiced by that failure because Cochran was an 'important' witness whose testimony in the penalty phase regarding petitioner's future dangerousness 'undoubtedly influenced' the jury and therefore clearly had a tendency to affect the result of his trial. The state responds that the record of the 1994 criminal trial on which petitioner relies demonstrates that the defendant in that trial was not able to impeach Cochran successfully. According to the state, nothing about the status of Cochran's license at the relevant time suggested that he was not a qualified expert, and his 'self-described efforts to keep dangerous criminals locked up would almost certainly appeal to many jurors.' The state argues that petitioner therefore was not prejudiced.[20]

"The post-conviction court's findings are supported by evidence in the record. In addition, we conclude that, even assuming that petitioner's criminal trial counsel failed to investigate and present at trial possible impeachment evidence concerning Cochran and that counsel's performance therefore did not meet the constitutional standard for a reasonable exercise of professional skill and judgment, petitioner did not demonstrate that he was prejudiced. In the 1994 criminal trial, Cochran contested the significance of the defendant's attempted impeachment evidence.[21] Nor do we view the attempted impeachment evidence, as ultimately presented to the jury at the 1994 trial and in light of Cochran's testimony in that trial explaining and refuting it, as necessarily tending to affect a jury's verdict. *See Horn [v. Hill,* 180 Or App 139, 148, 41 P3d 1127 (2002)] (whether a criminal defense counsel's failure to investigate, discover, or adduce evidence had a tendency to affect the outcome of a case must be assessed in light of the totality of the circumstances). Finally, as the record of the post-conviction proceeding demonstrates,[22] the jury in the 1994 case sentenced the defendant to death in spite of his attempt to impeach Cochran. For all of those reasons, this is not a case like *Loveless v. Maass,* 166 Or App 611, 999 P2d 537 (2000), in which the evidence that the post-conviction petitioner's criminal trial counsel had failed to adduce would likely have impeached the credibility of the key witness (who was also the victim) in, and therefore had a tendency to affect the result of, the petitioner's criminal trial. Petitioner's tenth assignment of error fails.

---

"[19]   The records were entered in evidence in the 1994 trial as part of the defendant's offer of proof regarding the admissibility of Cochran's answers to questions about the events described in the records.

"[20]   The state does not argue that petitioner's criminal trial counsel made a conscious tactical decision not to attempt to impeach Cochran.

"[21]   Cochran also testified in the 1994 criminal trial that he understood the Board of Psychologist Examiners records relied on by the defendant in attempting to impeach him to be confidential and that he was 'answering questions' based on those records only because he was 'required

to do so.' We do not address here the question whether Board of Psychologist Examiners records are confidential for any particular purpose.

"[22] Counsel for the defendant in whose 1994 criminal trial Cochran's qualifications were challenged testified in petitioner's post-conviction hearing that his client received the death penalty despite the attempt to impeach Cochran, and the defendant's judgment of conviction and sentence was received in evidence."

186 Or App at 250-53.

■ On reconsideration, petitioner first contends that the analysis quoted above misstates the test under Article I, section 11, of the Oregon Constitution for prejudice by requiring that he demonstrate that counsel's unprofessional performance "necessarily" tended to affect the jury's verdict. According to petitioner, consistently with *Krummacher v. Gierloff*, 290 Or 867, 883, 627 P2d 458 (1981), the proper test is whether counsel's errors "have a tendency to affect the result of the prosecution." Petitioner acknowledges that, in addressing his other assignments of error, we "did not expressly misdescribe the prejudice test." He asserts, however, that, at the least, we should modify our description of the test in the challenged portion of our opinion.

We did not intend to suggest that the adverb "necessarily" is part of the prejudice test. Rather, in using that adverb, we intended to indicate that petitioner did not meet his required burden of demonstrating that counsel's inadequate performance had a tendency to affect the result of his criminal trial. Nevertheless, we agree that our use of the adverb "necessarily" is subject to misinterpretation. We therefore modify the relevant sentence of our opinion to read as follows:

"Nor do we view the attempted impeachment evidence, as ultimately presented to the jury at the 1994 trial and in light of Cochran's testimony in that trial explaining and refuting it, as having a tendency to affect a jury's verdict."

Petitioner next argues that we erred in applying the prejudice test as elucidated in *Harris v. Morrow*, 186 Or App 29, 63 P3d 581 (2003), to counsel's failure to impeach Cochran's testimony. He argues that, consistently with

*Harris*, in determining whether that error had a tendency to affect the verdict in his case, this court was required to evaluate the entire record of his criminal trial, including evidence "untainted" by his criminal trial counsel's asserted error in failing to impeach Cochran's testimony, for the purpose of determining whether that evidence "independently and inevitably" would have led to a conviction notwithstanding counsel's error. Petitioner also argues that, in weighing his proposed impeachment evidence, this court is required to accept that evidence "at face value." He argues that, instead, this court improperly determined that the impeachment evidence was inconsequential and, hence, not prejudicial based on Cochran's testimony in the 1994 aggravated murder trial purporting to refute that he was biased. He asserts that this court thus improperly usurped the role of the jury by considering the persuasiveness of the impeachment evidence itself. Finally, petitioner notes that Cochran and Wise were the only witnesses who testified regarding his possible brain injuries and that Cochran's testimony was "highly likely to influence jurors," particularly in light of the prosecutor's references in her summation to Cochran's expertise and reputation; conversely, according to petitioner, the evidence impeaching Cochran that he adduced at his post-conviction proceeding "was susceptible of showing that Cochran was biased." Petitioner argues that, under those circumstances, his showing at the post-conviction proceeding was enough, as a matter of law, to demonstrate a tendency to affect the verdict.

In the alternative, petitioner asserts that, in *Harris*, this court applied an erroneous test to determine whether the petitioner was prejudiced. Petitioner argues that our analysis in that case—in which we weighed the testimony that the petitioner's criminal trial counsel failed to impeach against other evidence presented in the petitioner's criminal trial— was akin to a "harmless error" analysis that is, he contends, inappropriate in the context of post-conviction proceedings. He asserts that, instead, in determining whether criminal trial counsel's deficiency had a tendency to affect a verdict, the proper inquiry is simply whether trial counsel's error "infected"—by which we understand him to mean affected in some way that was harmful to the petitioner's case—some

"aspect of the case which went to prove something the jury must find in order to convict"—that is, some issue in the case. He argues that, applying that test here to trial counsel's failure to impeach Cochran's testimony regarding his future dangerousness, he was entitled to relief.

We first consider petitioner's alternative argument, that is, his challenge to this court's methodology as applied in *Harris*. In that case, we assumed without deciding that the post-conviction petitioner's trial counsel failed to exercise reasonable professional skill and judgment when counsel failed to impeach a witness's inculpatory testimony by means of the witness's prior exculpatory statements. We determined, however, that the petitioner was not prejudiced because there was "overwhelming evidence"—specifically, the inculpatory testimony of at least five other equally important witnesses—of the petitioner's guilt, so as to render counsel's failure to impeach the witness "inconsequential" and therefore lacking a tendency to affect the jury's verdict. We emphasized that, in making that analysis, we considered the "total context" and the "totality" of the evidence. *Harris*, 186 Or App at 38, 46. As we stated, "[o]ur determination of that question * * * requires an extensive consideration of the evidence presented at [the] petitioner's criminal trial." *Id.* at 38.

We reject petitioner's contention that *Harris* applied an improper analysis in determining whether a post-conviction petitioner was prejudiced by his or her criminal trial counsel's asserted deficiency. Where a petitioner's claim of inadequate assistance is based on trial counsel's failure to adduce or, conversely, to controvert evidence pertaining to a particular issue, the question is not simply whether counsel's failure had any negative effect regarding that issue. Rather, the question is whether the negative effect, if any, as to that issue in turn affected the result in the proceeding as a whole. *See Horn*, 180 Or App at 146-49 (explaining test). Thus, an assessment of other evidence pertaining to the issue, as well as any other aspects of the criminal trial that are pertinent to the issue (such as a jury instruction pertaining to it), considered in light of the issues at trial in their entirety, is the proper method for determining whether, *in the totality of the circumstances*, counsel's error had the required "tendency to affect the jury's verdict." *See, e.g., Lichau v. Baldwin*, 333 Or

350, 363-65, 39 P3d 851 (2002) (where the petitioner's criminal case turned primarily on the credibility of the petitioner and the victim, evidence pertaining to the petitioner's alibi would have had a tendency to affect the jury's consideration of the petitioner's and the victim's own versions of events leading up to the crime, which also were in evidence in the trial, as well as providing a basis for requesting a jury instruction on the question of the petitioner's whereabouts at the time of the crime; the petitioner therefore was prejudiced by counsel's failure to present the alibi evidence). In short, we reject petitioner's argument based on *Harris.*[2]

Before reconsidering our application of the prejudice standard to the specification of inadequate assistance asserted in petitioner's tenth assignment of error, we also briefly consider another preliminary question. As noted, petitioner also argues that, in assessing the record, we are obligated to accept his proposed impeachment evidence, as adduced in the post-conviction proceeding, "on its face." He argues that, in concluding that the missing impeachment evidence was "inconsequential," we in effect usurped the jury's function of determining the proper weight of the evidence.

To the extent that petitioner is arguing that, in determining the effect of his proposed impeachment evidence, we may not weigh it against contrary evidence presented by the state in the post-conviction proceeding, we disagree. Petitioner cites no authority for that proposition, and we have not found any.[3] Nor do we perceive any reason why we cannot consider the state's contrary evidence. We reject petitioner's apparent argument to that effect.[4] *Cf. Williams v.*

---

[2] In his petition for reconsideration, in addition to requesting reconsideration of our disposition of his tenth assignment of error, petitioner also, without elaboration, states, "Insofar as this court relied on the *Harris* rule in addressing [petitioner's] other assignments of error, [p]etitioner requests reconsideration of those portions of the opinion as well." Ordinarily, the appellate courts of this state will decline to address an undeveloped argument. In any event, here, we need not reconsider other portions of our opinion because, as discussed above, we reject petitioner's challenge to the methodology employed in *Harris*.

[3] Moreover, petitioner did not argue in the post-conviction court that the state's evidence offered for the purpose of rehabilitating Cochran's testimony or otherwise demonstrating that petitioner was not prejudiced by the failure to impeach Cochran was irrelevant or that, for any other reason, such evidence could not be considered by the post-conviction court.

[4] In our original opinion, in determining whether petitioner was prejudiced by his trial counsel's failure to impeach Cochran, we referred in part to the fact that

*Cupp*, 16 Or App 232, 237, 518 P2d 181 (1974) (the prosecution's failure to disclose certain exculpatory witness statements to the defense in the post-conviction petitioner's underlying criminal trial "would present a serious question" if not for evidence also presented in the post-conviction proceeding demonstrating that the witnesses would have denied having made those statements).

We turn, finally, to our reconsideration of the factual merits of petitioner's contention that he was prejudiced by his trial counsel's failure to impeach Cochran. Again, in our original opinion, we expressly analyzed petitioner's proposed impeachment evidence pertaining to Cochran, and the state's countervailing evidence, as presented in the post-conviction proceeding. We adhere to that analysis. However, we also add the following supplementary discussion. By doing so, we make explicit what was implicit in our earlier opinion: that, in determining whether petitioner was prejudiced by his criminal trial counsel's failure to impeach Cochran's testimony regarding petitioner's future dangerousness, the relevant "circumstances" to be assessed include not only evidence presented in the post-conviction proceeding but also the record of petitioner's criminal trial.[5]

■    As we stated in our original opinion, in his testimony in the penalty phase of petitioner's criminal trial, Cochran

the jury in the 1994 aggravated murder case convicted the defendant and sentenced him to death despite that defendant's attempted impeachment of Cochran. Petitioner does not expressly challenge our reliance on the result of the 1994 trial. We recognize, however, that, at the time of petitioner's trial in 1992, that information would not have been available to rebut any attempted impeachment of Cochran. We nonetheless regard the information as a useful indicator of the prejudicial effect of petitioner's proposed impeachment evidence. In any event, as discussed below, we now clarify that the state's evidence presented in the post-conviction proceeding to rebut petitioner's proposed impeachment evidence was not the only—or even, ultimately, a necessary—component of our analysis regarding prejudice.

[5] In arguing that his criminal trial counsel's failure to impeach Cochran had a tendency to affect the outcome of his trial, petitioner points to the opinion of his expert witness, Wise, that petitioner suffered from brain damage and therefore did not act deliberately during the murder; Wise's opinion that medication could control violent outbursts by individuals such as petitioner; and the prosecutor's argument comparing Cochran's and Wise's testimony. Petitioner does not identify any other portions or aspects of the record of his criminal trial that he believes compel the conclusion that he was prejudiced by the failure to impeach Cochran.

opined that it was probable that petitioner would commit criminal acts of violence that would constitute a continuing threat to society. Cochran testified that he based his opinion on petitioner's "juvenile history and his corrections records in Oklahoma," as well as records pertaining to the instant offense. Aspects of petitioner's juvenile and criminal history that Cochran found significant included incidents in which he made threats against his mother and sister, against a woman friend, and against a police officer and the officer's family. Cochran noted that, according to petitioner's mother, petitioner had an uncontrollable temper; petitioner had assaulted his mother and sister and they had obtained restraining orders against him. Cochran also noted that petitioner reportedly had "picked on" and frightened other children, had been expelled from school for fighting, and had abused alcohol and drugs; he had committed burglaries in which weapons were taken; he had severely injured a person named Ridenour; he had attempted to have sex with his sister; and he had raped two women. Cochran referred to the facts that, while incarcerated, petitioner had reportedly committed various forms of misconduct, including possessing contraband and threatening, fighting with, committing "unprovoked assaults" against, and attempting to rape other inmates; and that he had been revoked from parole at least three times. Cochran also explained that it was significant that the victim in this case had suffered multiple stab wounds, including defensive wounds—indicating that she was "fighting or struggling"—and that she was killed "under the situation of a rape." Finally, Cochran found significant that, after petitioner was arrested for killing the victim in this case, he told his mother that he had no remorse.

Cochran concluded that those facts and incidents indicated an "assaultive individual. An individual who is quite antisocial in his orientation towards life." Cochran also believed that there was a "sadistic component," a "prevalent pattern he has of using physical cruelty or violence towards others for establishing dominance and getting other people to be scared of him" and that petitioner "humiliates and demeans people." He believed that petitioner had a "fascination with violence, with fighting. With his domination of

other people." He believed that alcohol played some role in petitioner's conduct but noted that many incidents had been perpetrated in the absence of alcohol.

Cochran also testified that petitioner had taken a psychological test, the Minnesota Multiphasic Personality Inventory (MMPI), and that persons who had scores similar to petitioner's typically have a short attention span, are anti-social, tend to "act out," have poor impulse control, resent authority, and have chronic legal "difficulties." He testified that petitioner's score was "associated with a rapist profile" and with persons who lack shame, guilt, or remorse. Cochran believed that petitioner suffered from an antisocial person-ality disorder with "certain sadistic features" and "sexual aggressor features." Cochran explained that his diagnosis was supported by evidence in petitioner's record relating to his "runaways," his physical fighting, his bullying, his lying, his burglaries, the incident in which he robbed and maimed Ridenour, and his reported rapes of his sister and others.

Petitioner's expert witness, Wise—a licensed clinical psychologist with a specialty in neuropsychology—testified that he had interviewed petitioner, had administered a bat-tery of psychological tests to him including the MMPI, and tests of his "frontal lobe functioning" and had reviewed "his-torical" records pertaining to petitioner, including his school records, records of his "past involvement in criminal behav-ior," and records of interviews with petitioner's family mem-bers and other persons who knew him. Wise did not expressly testify regarding the probability, if any, that petitioner would commit criminal acts of violence that would constitute a con-tinuing threat to society. Rather, Wise testified that peti-tioner was impulsive; that his history included "a pattern of fights" and "difficulty in stressful situations"; that he previ-ously had used weapons or threatened persons with weap-ons; and that, on various occasions, petitioner had exhibited "bullying tactics" and engaged in cruel, demeaning, and humiliating behavior toward others. Wise also testified that petitioner's score on the MMPI indicated a person who "typi-cally" was impulsive, who had "difficulties with authority," and who had "difficulties conforming one's behavior to social

norms."[6] Wise testified that he had diagnosed petitioner as "clearly" and "absolutely" suffering from antisocial personality disorder. Wise also believed that petitioner suffered from alcohol abuse and that, when he was drinking and was confronted with a situation that "involves anger," he would not be likely to "think things through." Wise testified that petitioner also suffered from "organic personality syndrome" and that that syndrome manifests itself in "difficulty controlling or modu[l]ating one's behavior" and in "outbursts of anger." Although Wise declined to diagnose petitioner as suffering from a sadistic personality disorder, he believed that petitioner "certainly has engaged in sadistic kinds of behaviors."

When asked whether persons like petitioner were treatable, Wise opined that, although it was "unlikely" that his organic brain dysfunction could be ameliorated, treatment for that condition typically would focus on changing a person's outward behavior, for example through anger management and through psychiatric medications. Wise testified that he would expect drug therapy to affect petitioner by reducing his "explosiveness," his "short fuse, the violence and rage that seems to be not well modulated by the frontal lobes." As for petitioner's antisocial personality disorder, Wise stated that that disorder is "very hard to treat" and that "the best thing you can do" is to provide a highly structured environment.

On rebuttal following Wise's testimony, Cochran was asked whether a person suffering from "prefrontal lobe damage" would be able to engage in "planning associated with things like eliminating evidence and fleeing from a [crime] scene * * * and cover up his involvement in a crime." Cochran responded that, if the damage were very severe, the person would not be able to engage in such planning and that, if the damage were "moderate to severe," the person "[p]robably" would not be able to do so. Cochran described several ways in which a person suffering from organic personality syndrome differs from a person suffering from antisocial personality disorder. He noted that a person who

[6] Wise explained that the MMPI examines both a person's "traits or personality characteristics" and the person's "current psychological state."

suffers from antisocial personality disorder typically is "predatory" and "quite aggressive." He testified that persons with organic personality syndrome typically have a greater ability to feel guilt and remorse for their aggressive actions and lack a hidden motive—such as to intimidate or manipulate—for their "affective instability." On cross-examination, Cochran agreed that organic personality syndrome typically is treated with drug therapy and that, depending on the severity of the individual's deficits, such treatment "does tend to get results to some exten[t]."

Testimony of other witnesses in the penalty phase of petitioner's trial also was relevant to the question of petitioner's future dangerousness. Petitioner's mother testified that petitioner had an "alcohol problem" and a "bad temper," that he had been expelled from school for "fighting," that, when he was about 15 years of age, he had threatened her with a knife, and that, on another occasion, he had threatened to kill her and the whole family; she testified that she recently had obtained a restraining order against petitioner. Petitioner's mother also testified that, after petitioner was arrested for murdering the victim, he was "calm" and "felt no remorse." Petitioner's sister testified in the penalty phase that she had been afraid of petitioner for as long as she could remember; she testified that he had a bad temper, that he was "always bullying" her, that he had hit her many times, that he had threatened to kill her, and that he had threatened to kill his mother by "slit[ting] her throat." Petitioner's sister also testified that, when she was 11 or 12, petitioner had forced her to have sex with him.

A friend of petitioner, Willis, testified in the penalty phase about an incident in which petitioner threatened to kill her, forced her to perform oral sex on him, and, after she attempted to call someone to help her, held a knife to her throat and hit her in the face and stomach. Another friend, Lunn, testified about an incident in 1990 in which, following a party at a friend's house, petitioner jumped onto the bed in which she was sleeping, held a knife to her throat, and forced her to drive him home. When Lunn asked to go to the bathroom, he forced her to go "outside" in the snow while he watched. Lunn testified that, as she was driving petitioner home, he held a knife "to my side in my ribs" and repeatedly

told her that he would kill her; she testified that he was "very angry" and that she believed he would kill her. Petitioner's former girlfriend, Rogers, testified that, on one occasion, petitioner shoved her, choked her, pushed her into a bedroom, pushed her down to the floor, pulled her pants down, and had sex with her "with [her] begging him not to." Petitioner also warned Rogers not to tell anyone and made "verbal threats" against her two-year-old child. On another occasion, after Rogers drove petitioner to his mother's house, he put his fist through the window of her car.

Collins, a police officer in Poteau, Oklahoma, testified that, around 1988, petitioner was convicted of several burglary charges involving the theft of weapons. On another occasion, after Collins arrested petitioner for driving under the influence, petitioner attempted to escape from custody, "had a scuffle" with Collins, threatened to kill Collins, and stated that he would "burn down [his] house with [his] wife and kids in it." Larry Tustin, a State of Oklahoma probation and parole officer, testified that petitioner was placed under supervision for waving a knife at his mother and stepfather; he described petitioner as having "poor impulse control" and a history of antisocial behavior. Another Oklahoma probation and parole officer, Brett Tustin, testified that, in August 1991, petitioner was arrested on Oklahoma felony charges of robbery with a dangerous weapon and maiming.

Daniel Ridenour testified that, in August 1991, he was driving around in Poteau, Oklahoma, with petitioner and petitioner's brother, both of whom he had just met. After Ridenour got out of the car to go to the bathroom, petitioner ran toward him, grabbed him by the throat, threw him down, straddled his back, held him by his hair, and held a knife to his throat while petitioner's brother kicked and hit him; petitioner then took Ridenour's billfold, his car keys, and his knife. Ridenour testified that his injuries included a broken nose, jaw, and cheek bones; he spent four weeks in the hospital and eventually had three plastic surgeries.

Robertson, who in 1988 was incarcerated with petitioner in the Leflore County, Oklahoma, jail, testified that petitioner hit him with a broomstick and his fists, resulting in five stitches in Robertson's chin and other cuts to his face.

An inmate of the Douglas County Jail, Bratlie, testified that he had heard petitioner state that he hated "snitches" and would "[t]ake their heads off." Another inmate of the jail, Thomas, testified that petitioner had come into his cell while he was sleeping and hit him in the face three or four times, fracturing a bone and injuring a nerve; Thomas did not tell authorities how his injuries occurred because he was afraid of petitioner. A Douglas County sheriff's deputy, Linda Backes, testified that petitioner's manner of becoming "upset" in the jail was to become "borderline violently upset. * * * He screams and hollers and pounds." Douglas County sheriff's deputy Haggin testified that petitioner told him in a "very threatening manner" that he would "bop [him] upside the head."

Finally, Jessica Brewer, a former social worker, testified that she had worked with petitioner and his family beginning in 1982, based on petitioner's truancy from school. When asked whether petitioner had had poor impulse control, Brewer responded, "He still has poor impulse control. [Petitioner] is an explosive personality."

Considering the entirety of the described testimony in the penalty phase of petitioner's criminal trial—as well as relevant evidence in the guilt phase[7]—we are persuaded that there was compelling evidence demonstrating that it was probable that petitioner would commit criminal acts of violence that would constitute a continuing threat to society, as provided in ORS 163.150(1)(b)(B), and that, conversely, even if petitioner's trial counsel had impeached Cochran in the manner elucidated in the post-conviction proceeding, such impeachment would not have tended to affect the result of petitioner's trial.

First, there was essentially no dispute about the historical circumstances on which Cochran expressly relied in forming his opinion of petitioner's future dangerousness.

---

[7] In determining under ORS 163.150(1)(b) whether a defendant should be sentenced to death, a penalty phase jury also may consider evidence presented in the guilt phase of the trial. ORS 163.150(1)(a). In concluding that petitioner's criminal trial counsel's failure to impeach Cochran did not prejudice petitioner, we also have considered such evidence, including evidence of the manner in which petitioner murdered the victim in this case.

Those circumstances were also described (often in greater detail) by other witnesses in petitioner's criminal trial, and petitioner's expert, Wise, also relied on them in making his assessment of petitioner's condition. Accordingly, impeachment of Cochran would not have lessened the significance to the jury of those facts.

Second, Wise shared Cochran's expert opinion that petitioner had poor impulse control[8] and that he suffered from antisocial personality disorder with sadistic features. Moreover, Wise himself believed that petitioner's antisocial personality disorder was "very hard to treat" and that, at best, it could be controlled through a highly structured environment. Thus, trial counsel's failure to impeach Cochran logically lacked a tendency to affect the jury's view of that possible basis for a finding of future dangerousness, as well.

Wise also testified that petitioner suffered from an organic brain injury and that the syndrome arising out of that injury was treatable through behavior modification and psychiatric medications. In rebuttal, Cochran implicitly disputed Wise's diagnosis; for example, when asked whether a person suffering from "moderate to severe" prefrontal lobe damage would be able to engage in "planning associated with things like eliminating evidence and fleeing from a [crime] scene * * * and cover up his involvement in a crime"—evidence of which had been presented in the guilt phase of petitioner's criminal trial—he opined, "Probably not." However, Cochran agreed with Wise that organic personality syndrome typically is treated with drug therapy and that, depending on the severity of the individual's deficits, such treatment "does tend to get results to some exten[t]." Thus, even assuming that Cochran's testimony affected the jury's view regarding whether petitioner in fact suffered from organic personality syndrome, his testimony regarding the treatability of the syndrome vitiated that effect as regards the ultimate issue, namely, petitioner's future dangerousness. Equally significantly, where Wise did not dispute—indeed, "absolutely"

---

[8] As noted, petitioner's former social worker, Brewer, also shared Cochran's opinion regarding petitioner's lack of impulse control.

believed—that petitioner suffered from antisocial personality disorder, whether petitioner also suffered from organic personality syndrome was of little consequence.

For all of the above reasons, as well as those discussed in our original opinion—including our consideration of the state's evidence, in the post-conviction proceeding, rebutting petitioner's proposed impeachment evidence—we adhere to our original conclusion regarding petitioner's tenth assignment of error. Petitioner's criminal trial counsel's failure to present impeachment evidence pertaining to Cochran did not have a tendency to affect the outcome of petitioner's criminal trial. *Cf. State v. Stevens*, 322 Or 101, 110, 902 P2d 1137 (1995) (trial counsel's inadequate performance in failing to present available information to the jury regarding the complaining witness's credibility deprived the post-conviction petitioner of "highly valuable impeaching evidence * * * that would have called into question pivotal testimony of the complaining witness"; trial counsel's failure therefore had a tendency to affect the result of the prosecution of the case).

Reconsideration allowed; opinion modified and adhered to as modified.