Argued and submitted June 24, 2011, reversed and remanded December 5, 2012

CRAIG H. AYER,
*Petitioner-Appellant,*

*v.*

Rick COURSEY,
Superintendent,
Eastern Oregon Correctional Institution,
*Defendant-Respondent.*

Umatilla County Circuit Court
CV061220; A140104

292 P3d 595

Michael R. Levine argued the cause for appellant. With him on the briefs was Matthew G. McHenry.

Erin C. Lagesen argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and David B. Thompson, Interim Solicitor General.

Before Armstrong, Presiding Judge, and Haselton, Chief Judge, and Duncan, Judge.

DUNCAN, J.

### DUNCAN, J.

Petitioner appeals the post-conviction court's judgment denying him relief from his convictions for first-degree rape, ORS 163.375, first-degree sodomy, ORS 163.405, and first-degree sexual abuse, ORS 163.427. He argues that his trial counsel was inadequate under Article I, section 11, of the Oregon Constitution and ineffective under the Sixth and Fourteenth Amendments to the United States Constitution in failing to properly litigate the state's motion to exclude all evidence that the victim had been abused in the past by other people, in failing to cross-examine the victim, and in failing to adequately present the defense case in closing argument.[1] We agree that counsel's litigation of the state's motion was deficient and reverse and remand for the post-conviction court to determine whether petitioner was prejudiced by that deficiency.

We are bound by a post-conviction court's findings of fact if they are supported by evidence in the record, and we review its legal conclusions for errors of law. *Horn v. Hill*, 180 Or App 139, 141, 41 P3d 1127 (2002). If the post-conviction court did not expressly make factual findings, and "there is evidence from which the facts could be decided more than one way, we will presume that the facts were decided in a manner consistent with" the court's ultimate conclusion. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). We begin by summarizing the relevant underlying facts from the post-conviction court's findings and the record.

In December 2000, T, the victim, who was then nine years old, reported to her teacher that petitioner had sexually abused her during the summer and fall of that year. T had been living with petitioner and his wife, Barbara Ayer, who is T's grandmother, since the spring of 2000.[2] At that time, the department of Services to Children and Families (DHS)[3] had been involved in removing T from her mother.

---

[1] Petitioner also argues that trial counsel was inadequate on two other bases. We reject those arguments without discussion.

[2] Although petitioner is not T's grandfather, he has been married to her grandmother since 1988, before T was born.

[3] That department has since been reorganized and is now part of the Department of Human Services. For ease of reading, we refer to both organizations as DHS.

After T reported that she had been abused, she was interviewed and examined at ABC House, a child abuse assessment center. In the interview, which was videotaped, she presented a detailed account of the abuse, which she described taking place in several locations in the Ayers' home and in their motor home. Her account included numerous details of sexual contact with petitioner. In the exam, Dr. Chervenak, a pediatrician, found that there was "an old healed tear" in T's hymen that was consistent with T's description of petitioner's abuse. Chervenak concluded that the tear had been caused by "trauma," that is, "some kind of pushing or tearing of the hymen." Chervenak opined that it would take at least six days for such an injury to heal. Petitioner was arrested and charged with rape, sodomy, and sexual abuse.

Before trial, the state moved *in limine* to exclude any evidence or mention of "[s]exual acts done by other people with [T] occurring at any time before [T] began to reside with [the Ayers]," "[s]exual acts done by [T] with other people during the same period of time, or [s]exual acts done by other people with each other in the presence of [T] during the same period of time." At the hearing on the state's motion, the state offered DHS reports and supporting documentation regarding five incidents that were representative of the information that the state sought to exclude. Those incidents were, briefly, as follows:

1. In September 1993, when T was two years old, she reported that "Puppa" had hurt her in her vaginal area. A police officer who spoke to her reported that she told him that Puppa had rubbed her vulva area. T called several men Puppa and was too young to interview.

2. In August 1994, a third party reported that T might have been the subject of abuse. T had told the third party that she played "honey" with Miller, her mother's live-in boyfriend. T had said that playing "honey" involved french-kissing while nude. She also reported that Miller would take off her clothes and his and get into bed with her. When she was interviewed by a DHS caseworker, T refused to discuss the matter.

3. In March 1996, a third party, Woolridge, reported that T had told another person that "grandpa licks her privates and sticks his finger in her private." Woolridge stated that T's maternal grandfather, Pruitt, had raped her when she was 10 and that he had also sexually abused T's mother. Woolridge stated that T's mother had allowed Pruitt to babysit T. When T was interviewed by a police officer, she denied any sexual touching.

4. In June 1996, a six-year-old boy reported that T had tried to teach him to have sex.

5. In April 2000, T reported that Miller had showed his penis to T and her sister. She also reported that she had found a pornographic movie in Miller's closet. T denied that she had ever been sexually abused.

At the hearing on the state's motion *in limine*, the state argued that, under OEC 412,[4] evidence regarding the episodes recorded in those reports and similar evidence should be excluded.

---

[4] OEC 412 provides, as relevant here:

"(2) Notwithstanding any other provision of law, in a prosecution for a crime [of rape, sodomy, or sex abuse], or in a prosecution for an attempt to commit one of these crimes, evidence of a victim's past sexual behavior other than reputation or opinion evidence is also not admissible, unless the evidence other than reputation or opinion evidence:

"(a) Is admitted in accordance with subsection (4) of this section; and

"(b) Is evidence that:

"(A) Relates to the motive or bias of the alleged victim;

"(B) Is necessary to rebut or explain scientific or medical evidence offered by the state; or

"(C) Is otherwise constitutionally required to be admitted.

"* * * * *

"(4)(a) If the person accused of committing rape, sodomy or sexual abuse or attempted rape, sodomy or sexual abuse intends to offer evidence under subsection (2) or (3) of this section, the accused shall make a written motion to offer the evidence not later than 15 days before the date on which the trial in which the evidence is to be offered is scheduled to begin, except that the court may allow the motion to be made at a later date, including during trial, if the court determines either that the evidence is newly discovered and could not have been obtained earlier through the exercise of due diligence or that the issue to which the evidence relates has newly arisen in the case. Any motion made under this paragraph shall be served on all other parties, and on the alleged victim through the office of the prosecutor."

In response to the state's argument, petitioner's trial counsel[5] argued that T's statements in the reports were prior false accusations of sexual abuse, which are not barred by OEC 412, as explained in *State v. LeClair*, 83 Or App 121, 130, 730 P2d 609 (1986), *rev den*, 303 Or 74 (1987), and that they showed T's "motive or bias," OEC 412(2)(b)(A). Trial counsel asserted that the defense should be permitted to present evidence regarding the episodes documented in the reports because such evidence would be

"relevant about motivation, about [T's] ability to make up stories, to accuse people in the past that it turned out that the [s]tate had every opportunity to investigate, in fact investigated, concluded that there was nothing, moved on. And so it becomes—it goes to the bias [or] motive to lie and not tell the truth about accusations of what happened."

Trial counsel further argued:

"We don't want to say, yeah these things happened. Yeah, she, she was sexually molested by whoever it is in these reports. We want to be able to elicit that she made these accusations and it panned out to be nothing. And that's totally a different analysis of, of 412. [If w]e were just going to say, 'Well, it happened beforehand and so it didn't happen. [Petitioner] didn't do this because it happened to [be] these other people,' that would be a different analysis. So that's not what we're saying. We're saying that she has made some accusations that were investigated, turned out to be nothing. We should be able to elicit that upon our defense."

Accordingly, the trial court considered whether the defense could present evidence regarding the episodes recorded in the reports and other evidence of prior abuse of T to show that T had made prior false allegations of abuse, *LeClair*, 83 Or App at 130, and that she had a "motive" to fabricate allegations against petitioner, OEC 412(2)(b)(A). The court concluded that, with the exception of the third episode, OEC 412 barred evidence about those episodes

---

[5] At trial, Cowan was petitioner's trial counsel. However, at argument on the state's motion, Cowan's colleague, Haberkost, appeared on petitioner's behalf. We refer to both Cowan and Haberkost as "trial counsel," as they worked together to represent petitioner.

because there was no proof that they were false.[6] As to the third episode, regarding T's maternal grandfather, the court held that, if trial counsel produced witnesses who could testify to T's initial statement and her later denial of any sexual abuse, the evidence would be admissible "as a recantation under *LeClair* and the statute."

At trial, the state presented testimony of T; people to whom T disclosed abuse by petitioner; police officers who spoke to T, Barbara Ayer, and petitioner on the day that T disclosed the abuse; the DHS caseworker who interviewed T at CARES; a lab technician; and Chervenak. T again gave a detailed account of the abuse. Among other things, she testified that petitioner had come into her bed wearing pajamas, but that when he slept with her grandmother, he did not wear pajamas. She also testified that some instances of abuse had taken place in the family room of the Ayers' home when she had been sleeping on a fold-out bed in that room. In the video, T stated that, on one occasion, "white stuff" came from petitioner's penis and got on the sheets, and petitioner washed the sheets. And, T stated that petitioner had carried her down a hallway from the family room to her bedroom. The state also played, and gave to the jury, the videotape of T's interview at ABC House. Trial counsel did not cross-examine T.

As recounted above, Chervenak testified that there was damage to T's hymen that was consistent with her description of the abuse. Chervenak also testified that, during the exam, she had asked T whether anyone had ever touched her inappropriately before, and T had said that no one had. The lab technician testified that, although she had looked for K-Y jelly stains or biological evidence on numerous items of clothing and bedding and three tubes of K-Y jelly seized from the Ayers' home, she had not found anything.

Police officers also testified about statements that petitioner had made about T after his arrest. Petitioner said that he could not "recall" abusing T, but commented that T was "all over him" and told an officer, "You don't know how

---

[6] The trial court concluded that OEC 412 did not apply to the fifth episode because it did not involve sexual conduct of T, but that, as things then stood, evidence about that episode was not relevant to the case.

that girl is. She's been around. She's not like a normal nine year old. She's like a much older girl." When an officer asked petitioner how old T seemed to him, he said that she seemed like she was 27 years old.

From the start of the case, trial counsel's "theory of the defense in this case was that [T] had been abused, but not by [petitioner.]" When he was asked, at the post-conviction trial, why he chose to concede that T had been abused rather than challenging Chervenak's evidence regarding T's hymen, trial counsel explained:

> "Because of all of that series of reports that were floating around, because of information that [petitioner] and I had discussed, there was a strong sense that she had been abused. There were a series of reports that we'd read, [DHS] reports, that suggested that."

Counsel pursued that theory in presenting evidence for the defense at trial. Barbara Ayer testified about T's life with the Ayers, including the fact that they had provided structure and responsibilities for her. She testified that T had sometimes rebelled against the new rules imposed on her. The morning that T reported the abuse, T and petitioner had had an argument and petitioner had told T that, if T's "attitude did not improve," she might not be able to stay with the Ayers any longer.

Barbara Ayer also testified that she was almost always at home and, as a result, petitioner and T were rarely, if ever, home alone. She testified that she did the laundry and that she would have known if someone else had done laundry. She explained that, for several months while T had lived with the Ayers, one of Barbara Ayer's sons, his wife, and their children, including an infant, had stayed with the Ayers as well. During that time, that family slept in T's bedroom, and T slept on a sofa bed in the family room. She testified that the Ayers had a parrot, Jake, who lived in the family room and who usually squawked and made noise when anyone moved around in that room.

The defense case also included testimony from Brinson, Barbara Ayer's daughter-in-law whose family had stayed with the Ayers; from Sofich, Barbara Ayer's daughter,

who had known T since birth; and from petitioner. Brinson confirmed Barbara Ayer's and petitioner's testimony about what life was like in the Ayers' household. None of the defense witnesses testified regarding any prior abuse of T or about T's life with her mother. Also absent from the defense case was any mention of Pruitt, Miller, anyone that T referred to as Puppa, or any other potential abuser of T.

In closing argument, counsel conceded that "[t]here is sufficient, credible, believable medical evidence before you that this child has been abused." He argued that DHS had been involved in T's life and that "there were longstanding problems." He told the jury, "[y]ou heard bits and pieces of the circumstances" of T's life. He argued that T's allegations were the result of "magical thinking," and he asked the jury to consider "[w]hat she says and where she says and how she says these things occur. He's going to walk out in the middle of the night, house full of people[,] and do these things with Jake hanging around? It doesn't work. Are people there? Are people not there?" The jury convicted petitioner.

After petitioner's appeal was affirmed without opinion, petitioner filed a petition for post-conviction relief, alleging that trial counsel was inadequate in numerous ways. Trial counsel submitted an affidavit explaining his view of the case and, at the post-conviction trial, petitioner's post-conviction counsel cross-examined trial counsel. Petitioner testified on his own behalf, and he also presented testimony by Susan Reese, an expert in the defense of sexual-abuse cases. Reese had reviewed petitioner's case and opined that trial counsel's performance was deficient in several particulars, including in litigating the state's motion *in limine*, in failing to cross-examine T, and in closing argument. After trial, the post-conviction court denied relief on all of petitioner's claims. Petitioner appeals.

To obtain post-conviction relief based on inadequate assistance of counsel under Article I, section 11,[7] a petitioner

---

[7] Article I, section 11, provides, in part, "In all criminal prosecutions, the accused shall have the right * * * to be heard by himself and counsel[.]"

must show, "by a preponderance of the evidence, facts demonstrating that trial counsel failed to exercise reasonable professional skill and judgment and that [the] petitioner suffered prejudice as a result." *Trujillo v. Maass*, 312 Or 431, 435, 822 P2d 703 (1991). To prove prejudice, the petitioner must establish that counsel's deficient performance had "a tendency to affect the result of the prosecution." *Stevens v. State of Oregon*, 322 Or 101, 110, 902 P2d 1137 (1995) (internal quotation marks omitted); *Horn*, 180 Or App at 148. To establish ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments,[8] a petitioner must prove that counsel's performance "fell below an objective standard of reasonableness" and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 US 668, 687-94, 104 S Ct 2052, 80 L Ed 2d 674 (1984).

On appeal, petitioner first argues that trial counsel's litigation of the state's motion *in limine* was deficient.[9] As noted above, in opposing the state's motion *in limine*, trial counsel argued that evidence about the incidents described in the DHS reports was not barred by OEC 412 because T's statements were prior false allegations of sexual abuse under OEC 412(2)(b)(A) and *LeClair*. Petitioner asserts that the decision to make that argument was not a "reasonable exercise of professional skill and judgment." *Lichau v. Baldwin*, 333 Or 350, 360, 39 P3d 851 (2002). Petitioner argues that any reasonable trial counsel would have made a different argument: namely, that evidence regarding

---

[8] The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defense."

[9] The state argues that the petition failed to allege deficient litigation of the motion *in limine* on the ground that petitioner now advances. Consequently, it asserts, we cannot address petitioner's argument. However, before the post-conviction court the state advanced the same argument that it now raises on appeal, and the post-conviction court ruled that the allegations of the petition encompassed petitioner's argument. The state does not cross-assign error to that ruling. Accordingly, we do not address the issue. *See, e.g., Horn*, 180 Or App at 146 (declining to reconsider the post-conviction court's conclusion that the petitioner's trial counsel performed deficiently where the state did not cross-assign error to it); *State v. Chatfield*, 148 Or App 13, 16, 939 P2d 55 (1997) (rejecting the state's argument that a motion was untimely filed in light of the trial court's ruling to the contrary and in the absence of a cross-assignment of error by the state).

the prior reports of abuse was not excluded by OEC 412 because it "rebut[ted] or explain[ed] scientific or medical evidence offered by the state," OEC 412(2)(b)(B). According to petitioner, reasonable trial counsel would have made that argument because it would have led to a ruling allowing counsel to introduce evidence regarding the prior reports of abuse of T to prove that T had been abused in the past; given the theory of the defense, that evidence was critical to the outcome of the case. Consequently, petitioner contends, trial counsel's failure to make that argument in response to the state's motion *in limine* was constitutionally deficient.

We agree that trial counsel's performance was deficient. "To the extent that trial counsel has conducted an investigation that is legally and factually appropriate for the case, '[t]he reviewing court will not second-guess a lawyer's tactical decisions unless those decisions reflect an absence or suspension of professional skill and judgment[.]'" *Adams v. Nooth*, 239 Or App 613, 617, 245 P3d 173 (2010), *rev den*, 350 Or 130 (2011) (brackets in *Adams*) (quoting *Cunningham v. Thompson*, 186 Or App 221, 226, 62 P3d 823, *adh'd to as modified on recons*, 188 Or App 289, 71 P3d 110 (2003), *rev den*, 337 Or 327 (2004)); *see also Strickland*, 466 US at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").

Here, trial counsel's decision to make the argument that he did, and not to make the argument that petitioner asserts he should have made, in response to the state's motion *in limine* reflects a suspension of professional skill and judgment. At the start of the case, the prosecutor gave the DHS reports to trial counsel, who read them. As a result of reading the reports, and as corroborated by his investigation, counsel believed that T had been abused in the past. He knew that the state would present medical evidence indicating that T had been abused. He planned to defend petitioner on the theory that T had been abused in the past, but petitioner had not abused T. The evidence of past abuse would explain how T was able to make such detailed

allegations of sexual abuse against petitioner and why the medical evidence indicated that she had been abused.

Thus, the state's motion *in limine* threatened a critical portion of the defense case. In light of the medical evidence that T had been abused, which trial counsel did not plan to challenge, it was incumbent upon the defense to show that someone else had abused T. In the absence of any such evidence, there would be no reason for the jury to conclude that anyone other than petitioner could have caused the damage to T's hymen. Consequently, if there was any way for trial counsel to preserve his ability to show the jury that T had been abused in the past, he had to do so; otherwise, his ability to defend petitioner the way he planned to would be compromised.

In fact, as petitioner points out, there was a way for counsel to preserve his ability to show the jury that T had been abused in the past. If he had argued against the state's motion *in limine* on the ground that evidence about the reports of prior abuse was not excluded by OEC 412 because it rebutted or explained the medical evidence of damage to T's hymen, then, at minimum, he would have been able to introduce testimony about T's statement that her maternal grandfather "licks her privates and puts his finger in her private" for the purpose of showing that someone else, not petitioner, had abused T and caused the damage to T's hymen.

That evidence would not have been excluded by OEC 412 because it was "necessary to rebut or explain scientific or medical evidence offered by the state," OEC 412(2)(b)(B). That is, the act that T reported in that statement provided an explanation for the "stretching or tearing" injury to T's hymen that Chervenak diagnosed. *See State v. Muyingo*, 171 Or App 218, 224, 15 P3d 83 (2000), *rev den*, 332 Or 431 (2001) (holding that evidence that one of the victims had been raped in the past was admissible to explain medical evidence regarding injury to her hymen and that its probative value outweighed its prejudicial effect).[10] Consequently, testimony

[10] Trial counsel's failure to preserve petitioner's opportunity to introduce evidence regarding that episode to show that T had been abused in the past, alone, is sufficient to support our holding that his performance was deficient.

or other evidence about that statement would have been permitted to show that T had been abused in the past by someone other than petitioner.[11]

Instead of making that argument, however, trial counsel argued that he should be allowed to introduce evidence about the prior reports of abuse to show that T had fabricated allegations of abuse in the past, the state had investigated, and those allegations had turned out to be false. But, given the medical evidence and his theory of the case, counsel had to convince the jury that T had made allegations of sexual abuse in the past and at least some of those allegations were *true*. Trial counsel could have argued that some of T's prior allegations of sexual abuse were false, in support of a theory that T's allegations against petitioner were also false, but again, *given the medical evidence and his theory of the case*, trial counsel had to pursue admission of evidence that at least some of T's past allegations were true. Attempting to show that T had made false allegations in the past might have undercut T's credibility, but it could not have explained the medical evidence of abuse that trial counsel had no intention of challenging.[12]

We note that this is not a situation in which a petitioner challenges trial counsel's choice between two defense theories. *See, e.g.*, *Krummacher v. Gierloff*, 290 Or 867, 881, 627 P2d 458 (1981); *Adams*, 239 Or App at 618. As the record of petitioner's criminal trial shows, and as trial counsel explained to the post-conviction court, his theory of the case was that someone other than petitioner had sexually abused T and that that was why Chervenak found physical signs of sexual abuse. That tactical choice was a reasonable

Consequently, we do not decide whether evidence of the other episodes identified in the state's motion would have qualified as evidence necessary to rebut or explain the medical evidence.

[11] Although T's statement was hearsay, OEC 802, that would not have prevented it from being admissible. T's statement itself would have fallen within OEC 803(18a)(a), which provides an exception to the general ban on hearsay contained in OEC 802 for "[a] complaint of sexual misconduct [or] complaint of abuse as defined in ORS 107.705 or 419B.005."

[12] At the post-conviction trial, trial counsel could not explain why Haberkost made the argument that he did; instead, in his affidavit, he asserted that he had successfully introduced evidence that T had been abused in the past. Our review of the record did not reveal any such evidence.

exercise of professional skill and judgment, *Stevens*, 322 Or at 110, and did not fall below an objective standard of reasonableness, *Strickland*, 466 US at 689. However, when the state moved to exclude evidence that was critical to his case, counsel inexplicably failed to make an argument necessary to support his tactical decision. Given that that argument would have preserved his ability to introduce critical evidence that T had been abused in the past, and considering that the argument counsel did make did not allow even the possibility of introducing that evidence for the purpose for which it was essential to the defense, trial counsel's litigation of the state's motion *in limine* was deficient.

The post-conviction court concluded that petitioner could not have introduced evidence regarding prior abuse of T, as documented in the reports, because it was "not impeachment and not relevant." Consequently, it held that trial counsel's performance was not deficient. As explained above, we reject that conclusion; trial counsel's performance was deficient.

Our conclusion that trial counsel performed deficiently, however, is not the end of the matter. Petitioner also bears the burden of proving that trial counsel's deficient performance prejudiced him, that is, that the error had "a tendency to affect the result of the prosecution," *Stevens*, 322 Or at 110, or that there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland*, 466 US at 694. Had the post-conviction court continued its analysis, it might have determined that, even if trial counsel's performance was deficient, nevertheless, that deficiency did not have a tendency to affect the result of petitioner's prosecution or create a likelihood that the result of the proceeding would have been different. It could have evaluated the evidence that petitioner presented to determine whether he carried his burden of proving that, but for his deficient litigation of the motion *in limine*, counsel could have presented available, admissible evidence regarding the reports of prior abuse of T. *See, e.g., Smith v. State of Oregon*, 201 Or App 520, 525, 119 P3d 801 (2005) (holding that the petitioner failed to prove prejudice where he provided no evidence that an omitted witness would have been available to testify or what she would have testified

to); *Carias v. State of Oregon*, 148 Or App 540, 547, 941 P2d 571 (1997) (denying post-conviction relief where the petitioner "provided no evidence by affidavit, testimony or otherwise as to what [an omitted witness's] testimony would have been" and "[t]here [was] no evidence that [she] would have been available to testify"). However, from the record, it does not appear that the court engaged in that analysis. Consequently, we remand for the post-conviction court to consider, in the first instance, whether trial counsel's deficient performance prejudiced petitioner.[13] *See, e.g., Cortez v. Nooth*, 239 Or App 294, 300, 244 P3d 825 (2010) (concluding that the post-conviction court erred in holding that the petitioner was not prejudiced by any deficiency and remanding for determination of whether trial counsel's performance was inadequate).

Now we turn to petitioner's two remaining arguments, which we address in reverse order. Petitioner argues that trial counsel's closing argument was deficient because counsel failed to "marshal the favorable evidence" and challenge T's credibility.[14] At oral argument, petitioner asserted that trial counsel had failed to even mention the evidence that was favorable to petitioner or argue against T's credibility. However, while the post-conviction court concluded, and we agree, that closing argument was "poor," we cannot say that it was constitutionally deficient. Contrary to petitioner's argument in his brief and at oral argument, counsel did refer to inconsistencies and implausible facts

---

[13] In response to petitioner's argument that the reports would have been admissible, the state responds that "most of the evidence contained in the reports would have been inadmissible hearsay because most of the reports of the victim's statements regarding possible prior abuse were third-party reports of statements the victim made, not reports of statements that the victim made directly to investigators." Even if *most* of the evidence would have been inadmissible, there still may be some evidence in the reports—statements of abuse made directly to investigators—that would be directly admissible.

[14] Petitioner also argues that closing argument was deficient because counsel failed to mention that petitioner was presumed innocent and that the state had the burden of proving the charges beyond a reasonable doubt. We consider trial counsel's omission of those topics from his closing argument to be very unusual. Nevertheless, we reject petitioner's argument because, as the post-conviction court found, the jury was properly instructed on those issues. We presume that a jury follows the instructions given. *State v. Thompson*, 328 Or 248, 271, 971 P2d 879 (1999). Consequently, we cannot conclude that any deficiency in counsel's failure to mention those principles prejudiced petitioner.

in T's story. He pointed out her casual attitude in the ABC House video when she spoke about the abuse, and he questioned her credibility. He argued that it was unlikely that petitioner would have abused T in the family room when Brinson and her family were at the house and "with Jake [the parrot] hanging around." He pointed out that Barbara Ayer was almost always home with petitioner and T. In short, trial counsel did marshal the favorable evidence—such as it was—and challenge T's credibility in closing argument.

That brings us to petitioner's remaining argument. Petitioner contends that trial counsel was deficient in failing to cross-examine T. He points out that Reese testified that trial counsel could have questioned T about a number of issues that might have undercut her story, including the fact that petitioner testified that he was not at home on one of the days when T said the abuse had occurred; the fact that the hallway down which she alleged petitioner had carried her was narrow and lined with breakable items; Jake the parrot making noise; and T's allegation that petitioner had washed her sheets. Petitioner also argues that trial counsel could have cross-examined T about inconsistencies in her statements about the timing of the abuse.

We agree with petitioner that trial counsel could have cross-examined T regarding all of those details. However, considering all of the circumstances of this case, we disagree that he was constitutionally required to do so here. T was 10 years old at the time of trial, and trial counsel testified that he was concerned that the jurors were sensitive to anything that they might perceive as an attack on her. In closing argument, trial counsel raised most of the issues that petitioner identifies, including T's demeanor in the video and in court, inconsistencies in her story, Jake the parrot, and the allegation that the abuse took place in the middle of the night without any family members waking up. As noted above, this court "will not second-guess a lawyer's tactical decisions unless those decisions reflect an absence or suspension of professional skill and judgment," *Cunningham*, 186 Or App at 226; *see also Strickland*, 466 US at 689. In light of the difficulty of effectively cross-examining a child victim, trial counsel's strategic choice not

to cross-examine T was a reasonable exercise of professional skill and judgment under the circumstances.

In sum, trial counsel performed deficiently in arguing against the state's motion *in limine*. We remand for the post-conviction court to determine, in the first instance, whether trial counsel's deficient performance prejudiced petitioner.

Reversed and remanded.